**So Ordered.**

**Dated: March 13th, 2020**



Whitman L. Holt
Bankruptcy Judge

*FOR PUBLICATION*

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re: <br><br> CLAAR CELLARS LLC, <br><br> Debtor. | Case No. 20-00044-WLH11 |
| In re: <br><br> RC FARMS LLC, <br><br> Debtor. | Case No. 20-00045-WLH11 <br><br> **MEMORANDUM OPINION** |

    The Bankruptcy Code contains many sections providing broad and flexible powers for courts to deploy to facilitate the rehabilitation of a given debtor based on the context of that debtor's case. Perhaps the most notable power (and probably the most incorrectly invoked) rests in Bankruptcy Code section 105(a)'s general enabling authority. There are myriad other broad grants of authority to be found, however, including in Bankruptcy Code section 363(b)(1).

    In these related cases, a dispute arose requiring exploration of the relief available under section 363(b)(1)'s generalized authority for a debtor in possession to "use" estate assets "other than in the ordinary course of business" subject to court approval. At the final hearing regarding the debtors' motions to authorize the use of cash collateral, the court, among other relief, authorized over the objection of the debtors' primary secured creditor the "use" of estate assets to allow the

MEMORANDUM OPINION           Page 1

20-00044-WLH11    Doc 130    Filed 03/13/20    Entered 03/13/20 16:15:44    Pg 1 of 14

partial payment of certain prepetition debt one debtor owed the other. The following provides the basis for the court's ruling.[1]

## BACKGROUND & PROCEDURAL POSTURE

This decision involves the affairs of two related but nonconsolidated debtors in chapter 11 bankruptcy cases – Claar Cellars LLC and RC Farms LLC. Claar and RC are both owned by the Whitelatch family and are part of a commercial enterprise that operates approximately 130 acres of vineyards, producing wines from the White Bluffs region of Washington.[2] Simplifying somewhat, the basic arrangement is that RC owns (or leases from a nondebtor trust affiliated with the Whitelatch family) and operates real estate on which several varietals of vinifera grapes are grown and harvested. Once RC picks the grapes, they are transferred to Claar. Claar then takes over the processing of grapes into finished wine and sells the resulting wine.

Pursuant to a grape purchase agreement executed in 1997 and since amended several times, Claar is obligated to repay RC for the grapes Claar receives. This economic arrangement has historically functioned in a fashion similar to a revolving demand note whereby a sum due RC is computed when Claar takes delivery of grapes and that sum is reduced as RC seeks repayment from Claar, which historically has roughly been on an "as needed" basis to enable RC to pay its separate expenses.

As of the January 9, 2020 petition dates for both debtors, RC asserts that it holds a secured claim of approximately $329,000 against Claar. After the petition dates, RC filed (then amended) a UCC-1 financing statement to protect its asserted security interest. RC contends this act is permitted under Bankruptcy Code sections 362(b)(3) and 546(b) in order to perfect or otherwise maintain lien rights arising under Washington state law.[3]

---

[1] The court explained the general basis for this decision on the record at the final hearing, but also indicated that this opinion would follow to more fully develop the reasoning behind the court's oral ruling.

[2] The White Bluffs region is located north of the City of Pasco and is part of the very large Columbia Valley American Viticultural Area (or AVA) that encompasses much of the area in Washington State east of the Cascade Mountains. As of the date of this opinion, applications are pending for White Bluffs and other regions in Washington to be recognized with their own, unique AVA designations. *See* Sophia McDonald, *5 New Washington AVAs on the Horizon*, SevenFifty Daily (Sept. 11, 2018), *available at* https://daily.sevenfifty.com/5-new-washington-avas-on-the-horizon/.

[3] *See* RCW 60.13.038 (creating a lien for grape growers who deliver fruit to wine producers that "attaches to the vinifera grapes delivered, to the wine producer's inventory, and to the wine producer's accounts receivable").

**MEMORANDUM OPINION** Page 2

Before their bankruptcy filings, Claar and RC both owed secured debts to HomeStreet Bank. HomeStreet's prepetition collateral includes various personal property owned by both debtors as well as real property owned by RC and by the nondebtor Whitelatch trust. HomeStreet's collateral includes "cash collateral" (as defined in Bankruptcy Code section 363(a)) held by each debtor entity.

After the bankruptcy filings, both debtors moved the court to authorize the nonconsensual use of cash collateral pursuant to Bankruptcy Code section 363(c)(2)(B). The motions sought authority for the debtors to spend HomeStreet's cash collateral during the 2020 calendar year based on separate budgets containing monthly line-item expenditures (with permitted variances and roll-forward capacity as detailed in the interim and final orders). In general terms, HomeStreet's cash collateral would be used (i) by RC to produce a 2020 grape crop and to maintain its real property, (ii) by Claar to continue to preserve, market, and sell bulk and bottled wine inventory, and (iii) by both debtors to fund expenses arising from these bankruptcy cases.

One line item crossing the two budgets represented proposed payments from Claar to RC on account of "vintage grapes." Per the revised budgets presented to the court at the final cash collateral hearing, Claar proposes to make seven monthly payments to RC during 2020, resulting in an aggregate transfer of $163,235 on account of RC's asserted prepetition secured claim – which represents just under 50% of the total claimed amount. Claar proposes to address the remainder of RC's claim in the plan or claims-allowance process. RC's budget and testimony at the hearing established that RC would be unable to operate its business postpetition (i.e., unable to complete the 2020 grape crop and maintain its real estate) if RC did not receive the budgeted postpetition payments.

HomeStreet objected to the proposed use of cash collateral for two main reasons. HomeStreet first argued that the debtors were not adequately protecting HomeStreet's petition date interests in the two debtors' property as required by Bankruptcy Code section 363(e). The debtors disagreed on the basis that the aggregate value of the property collateralizing HomeStreet's loan substantially exceeded HomeStreet's approximately $2 million claim.[4] The court ultimately did

---

[4] At one point HomeStreet argued that the adequate protection analysis must be performed on a precise, estate-by-estate basis, such that assets of a nondebtor entity or nonconsolidated related debtor could not be counted for purposes of establishing that a secured lender is adequately protected vis-à-vis a given debtor (in other words, HomeStreet maintained that only property belonging to Claar – not to RC or the Whitelatch trust – could be considered when determining whether HomeStreet's interests regarding the Claar estate were adequately protected). The court rejected this argument for two reasons. First, this position is inconsistent with case law

not need to resolve this question because RC proposed to grant an additional lien pursuant to Bankruptcy Code section 361(2) on otherwise unencumbered real estate owned by RC and recently appraised at $1.7 million (this property is generally called the "Taylor Flats" parcel). The court found that the value of the overall adequate protection package – all petition date personal and real property, plus Taylor Flats – significantly exceeded the amount of HomeStreet's claim and hence the debtors satisfied their burden under Bankruptcy Code section 363(p)(1). Thus, HomeStreet's interests in Claar's property were adequately protected as a consequence of the *RC estate's* pledge of additional collateral for HomeStreet's benefit – Claar itself offered and provided no additional collateral.

HomeStreet's second main objection to the use of cash collateral focuses on Claar's proposed payments totaling $163,235 to RC. HomeStreet argues that these payments would improperly satisfy a prepetition debt outside the context of a confirmed bankruptcy plan. More foundationally, HomeStreet also questions the secured status of RC's asserted claim against Claar on various factual and legal grounds. Although HomeStreet concedes that RC likely has some sort of secured claim under RCW 60.13.038, HomeStreet challenges the amount of the claim and scope of the lien. Therefore, argues HomeStreet, the court cannot rely on the secured status of RC's claim to permit Claar's postpetition payments. To support this position, HomeStreet points to Federal Rule of Bankruptcy Procedure 7001(2), which mandates that disputes about "the validity, priority, or extent of a lien or other interest in property" be determined in an adversary proceeding.[5]

---

and other authorities, which permit consideration of nondebtor (or, logically, related debtor) property as part of a holistic adequate protection analysis. *See, e.g.*, *In re T.H.B. Corp.*, 85 B.R. 192, 194 (Bankr. D. Mass. 1988); 2 COLLIER BANKRUPTCY PRACTICE GUIDE ¶ 41.06[3][d] (rev. 2019); *see also* the various additional authorities cited in or citing each of the preceding. Second, this position would lead to absurd results. Assume, for example, a scenario in which there are four related but nonconsolidated chapter 11 debtors that are jointly and severally liable to a single secured creditor. Assume further that the lender is owed $10 million and that each of the four debtors owns assets worth $5 million. Under HomeStreet's view, this lender would be undersecured and not adequately protected even though its loan is 100% overcollateralized on an aggregated basis. Such a result cannot be the law. *Cf. Official Comm. of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Capital, LLC)*, 501 B.R. 549, 597-602 (Bankr. S.D.N.Y. 2013) (concluding that secured creditors can aggregate collateral across multiple debtor entities for purposes of establishing whether they are oversecured under Bankruptcy Code section 506(b) and noting that a contrary rule "defies common sense").

5   HomeStreet also argued that the debtors could not rely on a "critical vendor" or "doctrine of necessity" theory to support Claar's payments to RC. Because the debtors conceded at the final hearing that they could not establish that RC was a critical vendor of Claar, the debtors disclaimed any reliance on this theory to justify the postpetition payments. As such, the court declines to address any issues regarding the continued viability of the "critical vendor" or "doctrine of necessity" doctrines or how those doctrines might be applied.

**MEMORANDUM OPINION**      Page 4

The court ultimately overruled HomeStreet's objections and granted the debtors' motions to use cash collateral on a final basis. Final cash collateral orders will soon be entered on both dockets.

## DISCUSSION

### *Jurisdiction & Power*

The court has subject matter jurisdiction regarding these bankruptcy cases and the debtors' motions pursuant to 28 U.S.C. §§ 157(a) & 1334(b) and LCivR 83.5(a) (E.D. Wash.). The parties' dispute regarding the application of Bankruptcy Code section 363 is statutorily "core" and "the action at issue stems from the bankruptcy itself."[6] Accordingly, the court may properly exercise the judicial power necessary to finally decide this dispute.

### *Bankruptcy Code Section 363(b)(1)*

When working with the Bankruptcy Code, one must always start with the text.[7] Here, the text of section 363(b) is straightforward: the relevant provision simply provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."[8] This plain text is generalized and sweeping; so long as the bankruptcy court approves a proposed transaction under defined standards discussed below, nearly any "use," "sale," or "lease" of property is permitted.

Section 363(b)(1) is, of course, not limitless. Its neighboring subsections impose restrictions in certain specified contexts.[9] Other sections similarly cabin or complicate its utility.[10] Applicable nonbankruptcy law also confines what might otherwise be permitted based solely on section 363(b)(1)'s text.[11] These assorted

---

[6] *See* 28 U.S.C. § 157(b)(2)(M); *Stern v. Marshall*, 564 U.S. 462, 499 (2011).

[7] *See, e.g.*, *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1661 (2019).

[8] The statutory text references only a "trustee," but in chapter 11 cases debtors in possession have the same rights and powers. *See* 11 U.S.C. § 1107(a).

[9] *See id.* § 363(b)(2), (d), (h), (o).

[10] *See, e.g., id.* §§ 332, 557(c), 1110(a)(1), 1166, 1168(a)(1).

[11] *See* 28 U.S.C. § 959(b) (requiring that bankruptcy trustees and debtors in possession "manage and operate the property in [their] possession . . . according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof").

statutory provisions throttle the force of section 363(b)(1), but what remains is an exceptionally powerful engine. This is undoubtedly by design insofar as section 363(b)(1) lies at the heart of a series of broad administrative powers sweeping widely to protect and maximize the bankruptcy estate for stakeholders.[12] And more notably, the provision codifies principles of long lineage in United States bankruptcy law – if an estate is to be maximized, then its representative must enjoy a flexible and broad mandate to use or sell the estate's assets to realize or create value.[13]

Advancing a step from the naked statutory text, one finds what seem to be judicially crafted limitations on section 363(b)(1). The best known of these limitations is the prohibition against using section 363 transactions to effectuate a "sub rosa plan" that evades chapter 11's detailed confirmation requirements.[14] This limitation comports with decisions in other contexts teaching that the Bankruptcy Code's generalized powers cannot be used to reach results prohibited elsewhere in the statute.[15] Indeed, the proscription may not be judge made after all insofar as principles of statutory construction require that the Bankruptcy Code be read as a whole[16] and that its general provisions yield to its specific provisions,[17] and hence the statutory scheme itself operates to prevent section 363(b)(1) from negating other parts of the statute.

The take-home lesson here is that section 363(b)(1) is not a tool to obviate prohibitions found elsewhere in the Bankruptcy Code, no matter how inconvenient those prohibitions may be in a particular case.

---

[12] *See* 11 U.S.C. §§ 361–366.

[13] *See, e.g.*, *Van Huffel v. Harkelrode*, 284 U.S. 225, 227-28 (1931); *Ray v. Norseworthy*, 90 U.S. (23 Wall.) 128, 134-35 (1875); *In re Yale Express Sys., Inc.*, 384 F.2d 990, 991-92 (2d Cir. 1967); *Hill v. Douglass*, 78 F.2d 851, 854 (9th Cir. 1935). *See also generally In re Lionel Corp.*, 722 F.2d 1063, 1066-71 (2d Cir. 1983) (tracing through the historical genesis of section 363(b) and explaining how "a liberal reading of § 363(b)" is consistent with how "a bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the Code" and "must have substantial freedom to tailor his orders to meet differing circumstances").

[14] *See, e.g.*, *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983).

[15] *See, e.g.*, *Law v. Siegel*, 571 U.S. 415, 421-23 (2014).

[16] *See, e.g.*, *Kelly v. Robinson*, 479 U.S. 36, 43-44 (1986); A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 24, pp. 167-69 (2012).

[17] *See, e.g.*, *Law*, 571 U.S. at 421; READING LAW § 28, pp. 183-88.

After being screened for any of the defects described above, the last hurdle a section 363(b)(1) motion faces is the standard for judicial approval. Bankruptcy courts typically review a transaction proposed under section 363(b)(1) using a "business judgment" standard.[18] This is a "deferential" standard pursuant to which a "bankruptcy court will generally approve" a reasoned decision by the debtor.[19] When the transaction involves or will benefit an "insider" of the debtor, however, bankruptcy courts must apply a heightened level of scrutiny to ensure the insider is not improperly benefiting from its control, access, or familiarity at the expense of outside stakeholders.[20]

Following application of these limiting principles, a debtor's ability to lease, use, or sell property of the estate under section 363(b)(1) remains a broad and exceptional tool. The section's potential is observed in the wild of section 363 sales. Sales implemented under Bankruptcy Code section 363(b)(1) can be crafted countless ways and showcase many features – sales of particular assets, assumption of certain liabilities, "designation rights" regarding executory contracts or unexpired leases, escrows, trueups, transition services rights, sharing of avoidance recoveries or other contingent estate assets, breakup fees, labyrinthian bid procedures, the list goes on.[21] Almost any acquisition transaction that could be built by imaginative M&A advisers outside of bankruptcy can be cast using Bankruptcy Code section 363. In fact, section 363(f)'s power to sell free and clear of interests in property turbocharges bankruptcy sales beyond their nonbankruptcy brethren. It is thus no surprise that section 363 sales have been used to rehabilitate many large and notable businesses, including General Motors, Chrysler, and the Lehman Brothers brokerage firm.[22] These examples represent only the tip of a

---

[18] *See, e.g.*, *In re Equity Funding Corp. of Am.*, 519 F.2d 1274, 1277 (9th Cir. 1975); *In re Ernst Home Ctr., Inc.*, 209 B.R. 974, 979-80 (Bankr. W.D. Wash. 1997).

[19] *See Tempnology*, 139 S. Ct. at 1658.

[20] *See, e.g.*, *In re Family Christian, LLC*, 533 B.R. 600, 622 & 627 (Bankr. W.D. Mich. 2015); *In re WK Lang Holdings, LLC*, 2013 Bankr. LEXIS 5224, at *22 (Bankr. D. Kan. Dec. 11, 2013); *In re Tidal Const. Co.*, 446 B.R. 620, 624 (Bankr. S.D. Ga. 2009); *In re Med. Software Sols.*, 286 B.R. 431, 445 (Bankr. D. Utah 2002); *In re Bidermann Indus. U.S.A., Inc*., 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997). The application of "rigid scrutiny" to insider dealings with debtors in bankruptcy has a robust heritage. *See, e.g.*, *Sawyer v. Hoag*, 84 U.S. (17 Wall.) 610, 623 (1873).

[21] For a deeper background discussion and exploration of issues involving section 363 sales, see Lee R. Bogdanoff, *The Purchase and Sale of Assets in Reorganization Cases—Of Interest and Principal, of Principles and Interests*, 47 BUS. LAW. 1367 (1992).

[22] *See Elliott v. Gen. Motors LLC (In re Motors Liquidation Co.)*, 829 F.3d 135, 145-47 (2d Cir. 2016) (General Motors); *Barclays Capital, Inc. v. Giddens (In re Lehman Bros. Holdings Inc.)*, 761 F.3d 303, 306-08 (2d Cir. 2014) (Lehman Brothers); *Ind. State Police Pension Trust v. Chrysler LLC (In re Chrysler LLC)*, 576 F.3d 108,

very large iceberg of businesses that have survived largely as a result of bankruptcy professionals' adroit use of section 363.[23]

Though possibly the most oft invoked, a sale is just one of three acts invited by section 363(b)(1). At issue here, the authority to "use" property (which, in the context of cash, usually involves paying others) may be even more flexible and adaptive. Once again, this is reflected by the multitude of transactions that are proposed and approved in practice. Among many examples, section 363(b)(1) provides authority for debtors to (i) settle litigation claims or transfer assets in settlement of claims against the estate;[24] (ii) implement tender offers to repurchase their securities;[25] (iii) refinance uneconomical secured debt or repay such debt following consummation of an asset sale;[26] (iv) construct restructuring support agreements containing carrots for creditors who bind themselves to a restructuring transaction, such as agreeing to pay the attorneys' fees of consenting creditors even if those creditors are undersecured or wholly unsecured;[27] and (v) exercise governance rights regarding nondebtor entities owned by the estate, such as by voting to approve a material transaction by such a nondebtor entity.[28] Subject to the limiting principles discussed above, "use" of property under section 363(b)(1)

---

111-12 (2d Cir.), *vacated and remanded with instructions to dismiss appeal as moot*, 130 S. Ct. 1015 (2009), *judgment vacated and appeal dismissed as moot*, 592 F.3d 370 (2d Cir. 2010) (Chrysler Corporation).

[23] Many commentators argue that section 363 sales are overused and have displaced traditional plan-based reorganizations in a problematic fashion. *See, e.g.*, Ralph Brubaker & Charles Jordan Tabb, *Bankruptcy Reorganizations and the Troubling Legacy of Chrysler and GM*, 2010 U. ILL. L. REV. 1375 (2010); Daniel J. Bussel & Kenneth N. Klee, *Recalibrating Consent in Bankruptcy*, 83 AM. BANKR. L.J. 663, 730-32 (2009). It is not for this court to resolve normative or policy debates about the desirability of section 363 sales relative to bankruptcy plans. Rather, the court must interpret and apply the statute that Congress has provided and leave the wisdom of its current provisions to the legislative branch. *See, e.g.*, *Baker Botts L.L.P. v. ASARCO LLC*, 135 S. Ct. 2158, 2169 (2015); *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 649 (2012).

[24] Settlements in bankruptcy are often proposed and assessed under the rubric of Federal Rule of Bankruptcy Procedure 9019 and the associated decisional law. The Bankruptcy Rules cannot "abridge, enlarge, or modify any substantive right," however, *see* 28 U.S.C. § 2075, which means the substantive authority to implement a settlement that is approved via the procedure of Rule 9019 must be tethered somewhere in the statute. The statutory basis to settle lies in section 363(b)(1) – a debtor either "uses" a chose of action by releasing it in a settlement or "sells" that property to the settlement counterparty. *See, e.g.*, *Adeli v. Barclay (In re Berkeley Del. Court, LLC)*, 834 F.3d 1036, 1039-40 (9th Cir. 2016).

[25] *See, e.g.*, *Del. Trust Co. v. Energy Future Intermediate Holdings, LLC (In re Energy Future Holding Corp.)*, 527 B.R. 157, 162-67 (D. Del. 2015), *aff'd*, 648 F. App'x 277 (3d Cir. 2016).

[26] *See, e.g.*, *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 510-13 (Bankr. D. Del. 2010).

[27] *See, e.g.*, *In re Stearns Holdings, LLC*, 607 B.R. 781, 792-93 (Bankr. S.D.N.Y. 2019); *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 464-67 (Bankr. S.D.N.Y. 2014).

[28] *See, e.g.*, *In re Equity Funding Corp. of Am.*, 492 F.2d 793, 794 (9th Cir. 1974); *Official Comm. of Unsecured Creditors v. Raytech Corp. (In re Raytech Corp.)*, 190 B.R. 149, 150-53 (Bankr. D. Conn. 1995); *In re Consol. Auto Recyclers, Inc.*, 123 B.R. 130, 140-41 (Bankr. D. Me. 1991).

is bound largely by the needs of specific bankruptcy cases and the creativity of the parties.

## The Jevic Opinion

Although not directly a decision about Bankruptcy Code section 363(b)(1), the Supreme Court's decision in *Czyzewski v. Jevic Holding Corporation*[29] articulates some important guiding principles.

In *Jevic*, the Supreme Court considered whether bankruptcy courts possess authority to order the distribution of estate assets in a manner inconsistent with the Bankruptcy Code's priority scheme over the objection of an aggrieved creditor as part of a structured dismissal. The Court answered the question in the negative, concluding that "[a] distribution scheme ordered in connection with the dismissal of a Chapter 11 case cannot, without the consent of the affected parties, deviate from the basic priority rules that apply under the primary mechanisms the [Bankruptcy] Code establishes for final distributions of estate value in business bankruptcies."[30]

In the process of explaining this conclusion, the Court juxtaposed circumstances in which bankruptcy courts have "approved interim distributions that violate ordinary priority rules."[31] The Court cited several examples of these permissible "interim" transactions intended to serve "significant Code-related objectives."[32] But, the Court noted, a wholesale structured dismissal implementing "a final disposition" of estate property did not advance anything the Court considered a "significant offsetting bankruptcy-related justification."[33] The Court's efforts to distinguish distribution schemes violative of both the text and

---

[29] 137 S. Ct. 973 (2017). For a detailed discussion of the facts, holding, and implications of this Supreme Court case, see *Professor Kenneth N. Klee and Whitman L. Holt on Supreme Court's Holding in Czyzewski v. Jevic Holding Corp.*, 2017 Emerging Issues 7529 (LexisNexis March 2017).

[30] *Jevic*, 137 S. Ct. at 978.

[31] *Id.* at 985.

[32] *See id.* ("Courts, for example, have approved 'first-day' wage orders that allow payment of employees' prepetition wages, 'critical vendor' orders that allow payment of essential suppliers' prepetition invoices, and 'roll-ups' that allow lenders who continue financing the debtor to be paid first on their prepetition claims.").

[33] *See id.* at 985-86. The list of examples of what a structured dismissal does not do provides at least some illustrative examples of what the Court viewed as important bankruptcy objectives. *See id.* at 986 ("it does not preserve the debtor as a going concern; it does not make the disfavored creditors better off; it does not promote the possibility of a confirmable plan; it does not help to restore the *status quo ante*; and it does not protect reliance interests").

foundational objectives of the Bankruptcy Code against schemes involving "interim distributions"[34] not strictly faithful to the former but designed to promote the latter is informative. Such a contrast necessarily rests on the unstated premise that the second category of transactions are permissible (after all, if none of these transactions are permitted, then what is the point of juxtaposing one impermissible outcome with a marginally-less-offensive-but-still-impermissible outcome?). This broader teaching of *Jevic* further shapes the contours of how a debtor may use the sweeping authority contained in Bankruptcy Code section 363(b)(1).[35]

## FINDINGS & CONCLUSIONS

The court has analyzed Claar's proposed periodic postpetition payments to RC using a heightened standard based on the "insider," or at least related, status of the debtors. And, because these debtors have not been substantively consolidated, the court has further analyzed the consequences of the proposal solely from the perspective of the Claar estate as a standalone entity. The court concludes that the proposed payments are a "use" of Claar cash that can potentially be approved under Bankruptcy Code section 363(b)(1). Based on the facts and circumstances of this particular case, that approval is warranted for several reasons.

First, it is clear that RC possesses a secured claim of some amount against Claar and RC has articulated a colorable basis under which it may be oversecured. In fact, RC's potential oversecured status seems likely since the broad language of the Washington statute providing the lien rights in question gives RC a lien on Claar's inventory and accounts receivable generally, regardless whether the inventory or accounts receivable are traceable to the delivered grapes, and there is no dispute that the value of Claar's inventory and accounts receivable exceeds the entire amount of RC's asserted claim. Either way, because RC has at least some interest in Claar's property, RC is entitled to adequate protection of that interest

---

[34] The *Jevic* opinion is unfortunately cryptic about the sense in which the Court was using the word "interim." There are several senses in which that word could be used. For example, "interim" could have a temporal context and differentiate distributions proposed to be made early in a bankruptcy case (such as first-day employee or critical vendor payments) from distributions that effectively end the case (such as the distribution of all remaining value via a "structured dismissal"). Alternatively, "interim" could be keyed to the particular counterparty and differentiate distributions that are subject to adjustment or refinement later in the case from distributions that effectively allow the counterparty to exit the case. As a further example, "interim" could be gauged by measuring the proportions of the estate that would be distributed and remain after the transaction. All of these are plausible interpretations of the word. As discussed further below, the specific payments proposed here are "interim" payments under any of these approaches, which means the court need not attempt to divine *Jevic*'s precise use of the word.

[35] *See, e.g., In re Nine W. Holdings, Inc.*, 588 B.R. 678, 690-91 (Bankr. S.D.N.Y. 2018).

**MEMORANDUM OPINION**     Page 10

20-00044-WLH11    Doc 130    Filed 03/13/20    Entered 03/13/20 16:15:44    Pg 10 of 14

under Bankruptcy Code section 363(e). "Periodic cash payments" are a specifically contemplated form of adequate protection in the Bankruptcy Code.[36] Thus, by making such payments to RC, Claar complies with one of its legal obligations and, in the likely event that whatever secured claim RC ultimately has against Claar is oversecured, this reduces Claar's exposure for postpetition interest under Bankruptcy Code section 506(b) with each periodic payment. These effects of the periodic payments on the Claar estate therefore advance "significant Code-related objectives."

Second, Claar's payments to RC are essential to RC's continued viability,[37] which, in turn, permits the court to approve the RC estate pledging Taylor Flats as additional collateral to adequately protect HomeStreet. After all, if RC cannot pay its anticipated postpetition obligations, the court likely would conclude that the RC case should be converted to chapter 7. And if this is the inevitable result, the court likely would conclude that an otherwise unencumbered asset of the RC estate worth as much as $1.7 million should not be used to collateralize HomeStreet's claims against the Claar estate. Thus, the reciprocal arrangement resolves problems facing both debtors and benefits all parties by allowing RC to remain operative, allowing Claar to fulfill its obligations to HomeStreet, and allowing HomeStreet to receive adequate protection of its interests (providing such adequate protection is plainly a "significant Code-related objective"). Indeed, since Claar lacks additional collateral to offer HomeStreet and since the value of its existing collateral (personal property, largely consisting of wine inventory) is the most uncertain in the adequate protection package, the credit support provided by RC may be essential to Claar's ability to use HomeStreet's cash collateral. If Claar sought such services from a third-party credit support provider, such as a financial institution that could issue a letter of credit for HomeStreet's benefit, the provider would require significant consideration in return. Allowing Claar to make periodic postpetition payments to RC avoids the inequity that would result if the Claar estate got a completely free ride on RC's credit support.

---

[36] *See* 11 U.S.C. § 361(1).

[37] Although the court can and does focus on the propriety of the proposed Claar payments solely from the perspective of Claar's estate on a standalone basis, the court need not don blinders to the truth that providing RC with some minimal liquidity advances an important bankruptcy purpose from the perspective of RC's estate. *See, e.g.*, *Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467, 470-71 (1974) (Douglas, J.) (describing "the collection of amounts owed the bankrupt to keep its cash inflow sufficient for operating purposes, at least at the survival levels" as a "basic consideration" of financial restructuring). If the analysis from the perspective of Claar's estate ultimately ended in perfect equipoise, the knock-on effect of advancing a key bankruptcy function for a related debtor likely would nevertheless be sufficient justification for the court to permit the proposed use of Claar's property, but the court does not rely on this justification for purposes of today's opinion insofar as the case from the perspective of Claar's estate is not a close call.

Third, the Claar estate receives other indirect benefits from the continued viability of RC. For example, Mr. Whitelatch testified at the final hearing that he is exploring whether he can sell all components of his family enterprise as a consolidated package, including the real property owned by Claar, RC, and the Whitelatch trust. Because such a package likely yields an aggregate value exceeding piecemeal liquidation values, the ultimate worth of the Claar estate increases simply by going along for the ride. The odds and price of such a sale are undoubtedly greater if RC is allowed to maintain its vines and the real property more generally than if that part of the package degrades in condition. Accordingly, the Claar estate again receives indirect benefits from RC's proposed maintenance expenditures, which further justify allowing Claar to make the proposed payments.

Fourth, the risk associated with these payments is minimal. Although the Claar estate will have approximately $163,000 of value leakage to the RC estate, RC possesses a secured claim that will capture some, if not all, of this value anyway. Moreover, more than 50% of the asserted RC claim will remain unpaid, which permits recalibration during the claims-allowance process.[38] To the extent an exact reconciliation is not possible such that the RC estate ultimately receives some modest overpayment relative to what it would have received absent the periodic payments, if not recoverable or offset by future obligations, such possible overpayment is still warranted to compensate the RC estate for the credit support and other indirect benefits enjoyed by the Claar estate. Finally, HomeStreet in particular is unlikely to be harmed as a result of the payments; the payments allow RC to preserve and maintain its vines and real property, which benefits HomeStreet insofar as those assets are among its collateral – no one, least of all HomeStreet, wins if the RC property falls into an undesirable condition with a concomitant reduction in realizable value. Because (i) these cases are still in their early stages, (ii) RC will still have a material remaining claim even after Claar makes the periodic payments, and (iii) the aggregate payment amount is not a significant portion of the overall value of the Claar estate, the court believes these payments are "interim" distributions under any meaning of that word in *Jevic*.

---

[38] For example, assume the following: (i) RC is ultimately allowed a first-priority secured claim of $150,000, leaving an unsecured claim of approximately $179,000 and (ii) general unsecured creditors of the Claar estate ultimately receive a 10-cent distribution. Under these assumptions, RC would have been entitled to receive $167,900 in total distributions ($150,000 for the secured claim plus $17,900 for the unsecured claim; the court is simplifying somewhat by ignoring any amounts that RC could potentially add to its secured recovery under Bankruptcy Code section 506(b) if the secured claim is ultimately oversecured). Through the periodic payments, RC would have already received $163,235 in value. To avoid an overpayment, the recovery on account of RC's remaining claim could be capped at $4665 (or roughly 2.6% of the allowed amount). Using these assumptions, there ultimately is no deviation from bankruptcy priority or reduction in the recovery of any other creditor, but rather simply a shift in the timing of when the RC estate receives some of its recovery from the Claar estate.

And because those interim distributions advance significant bankruptcy objectives without causing material (or perhaps any) harm to any other creditor, the distributions are appropriate.

Lastly, the court rejects HomeStreet's contention that an adversary proceeding must be completed to determine the extent of RC's lien before Claar can make any periodic payments to RC. The court makes no findings and reaches no conclusions that would directly or indirectly "determine the validity, priority, or extent of a lien or other interest in property" for purposes of Bankruptcy Rule 7001(2). Any legal or factual attacks that HomeStreet wishes to pursue against RC's asserted secured claim remain available and HomeStreet is free to file an adversary complaint that joins this battle. The court can approve partial payments to RC without resolving any of the issues that might be pursued in such an adversary proceeding. Indeed, courts often authorize payments to secured creditors despite potentially viable challenges to the validity, priority, or extent of the underlying lien that could be finally determined only via adversary proceeding. For example, a court may authorize adequate protection payments for an asserted secured creditor pursuant to a DIP financing or cash collateral order despite the underlying debt remaining the target of a future "challenge" by the creditors' committee.[39] Similarly, a court may authorize payments as part of a settlement under Bankruptcy Rule 9019 that *resolves* (but does not decide) lien disputes that could be finally determined on the merits only through adversary litigation. The court is aware of no requirement, nor does HomeStreet cite one, that every possible latent attack on an asserted secured claim be definitively resolved via adversary proceeding before the secured creditor can receive payments from the bankruptcy estate.[40] Indeed, such a formalistic requirement would be antithetical to the speed and flexibility that are among bankruptcy law's first principles.[41] Furthermore, in a

---

[39] *See, e.g.*, *In re Liquidation Outlet, Inc.*, 2010 Bankr. LEXIS 6245 (Bankr. W.D. Wash. Apr. 8, 2010).

[40] *See, e.g.*, *Lenders Prot. Grp. v. USA Commer. Mortg. Co. (In re USA Commer. Mortg. Co.)*, 2007 U.S. Dist. LEXIS 65264, at *39-40 (D. Nev. Aug. 29, 2007).

[41] *See, e.g.*, *Bullard v. Blue Hills Bank*, 135 S. Ct. 1686, 1694 (2015) ("[E]xpedition is always an important consideration in bankruptcy."); *Katchen v. Landy*, 382 U.S. 323, 328-29 (1966) (describing longstanding recognition "that a chief purpose of the bankruptcy laws is 'to secure a prompt and effectual administration and settlement of the estate of all bankrupts within a limited period'" (quoting *Ex parte Christy*, 44 U.S. (3 How.) 292, 312 (1845))); *Wiswall v. Campbell*, 93 U.S. (3 Otto) 347, 350-51 (1876) (emphasizing how "[p]rompt action is everywhere required by law," and that this principle requires quick resolutions of claims against a bankruptcy estate, as "[w]ithout it there can be no dividend"); *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 346-47 (1875) (discussing how "[i]t is obviously one of the purposes of the Bankrupt law, that there should be a speedy disposition of the bankrupt's assets," which is a goal "only second in importance to securing equality of distribution"); *Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 98 (3d Cir. 1988) (highlighting how "issues central to the progress of the bankruptcy petition, those likely to affect the distribution of the debtor's assets, or the relationship among the creditors, should be resolved quickly" (cleaned up)).

case such as this one where vital and time-sensitive issues would await the final outcome of any adversary proceeding, HomeStreet's proposed requirement would place undue influence over the timely resolution of such issues in the hands of an objecting party who has near complete temporal and tactical control regarding the filing, prosecution, and appeal of any adversary action.[42] In sum, because the court is not now making any determination that would implicate Bankruptcy Rule 7001(1), there is no need for an adversary proceeding or any other process to be completed before the court can authorize Claar's proposed payments to RC.

## SUMMATION

At day's end, section 363(b)(1) provides some of the most powerful and flexible authority contained in the Bankruptcy Code. These debtors have proposed a "use" of Claar's property that benefits Claar's estate (and HomeStreet), does not contravene any other section of the Bankruptcy Code, and falls squarely within the universe of "interim" distributions endorsed in *Jevic*. Because that proposed use of property is lawfully permitted and warranted by the facts and circumstances of these cases, the court granted the debtors' request as part of approving the debtors' use of cash collateral at the conclusion of a final hearing.

---

[42] To underscore this point, the court notes that HomeStreet has not filed an adversary proceeding to start the resolution of the dispute with RC. As the court observed at the final hearing, such a resolution may prove to be a purely theoretical exercise, because if general unsecured creditors of the Claar estate ultimately receive a full recovery – which outcome the debtors have suggested they hope to achieve – then it makes no difference whether and to what extent the RC claim is secured. Nevertheless, if HomeStreet believes this is an issue worth pursuing, HomeStreet remains able to commence its desired adversary proceeding at any time.