

**So Ordered.**

**Dated: January 14th, 2021**

Whitman L. Holt
Bankruptcy Judge

*FOR PUBLICATION*

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re: | Lead Case No. 20-00044-WLH11 |
| CLAAR CELLARS LLC, | (Jointly Administered) |
| -and- | |
| RC FARMS LLC, | **MEMORANDUM OPINION** |
| Debtors. | |

The wine business is difficult even during the best of times.  The year 2020 was not the best of times.

Two affiliated debtors engaged in the wine business seek confirmation of a chapter 11 plan that is opposed by their primary secured creditor, HomeStreet Bank.  HomeStreet in turn proposed a competing chapter 11 plan that the debtors oppose.  After fully considering the evidence presented at a lengthy evidentiary hearing and substantial briefing by the parties, the court has determined that the debtors' plan does not meet the requirements for confirmation but that HomeStreet's plan does.  As a result, the court will confirm HomeStreet's plan.

## BACKGROUND & PROCEDURAL POSTURE

Since the 1980s, Robert and Crista Whitelatch have participated in the wine industry by growing vinifera grapes in the White Bluffs region of Washington

**MEMORANDUM OPINION**          Page 1

20-00044-WLH11    Doc 488    Filed 01/14/21    Entered 01/14/21 15:45:10    Pg 1 of 34

State.[1]  In the 1990s, the Whitelatch family expanded operations by producing and selling finished wine under the Claar Cellars label.  Claar Cellars now makes numerous varietal and blended cuvees.  Over the years, Claar Cellars has received an array of awards and other recognitions for the quality of its wines and the sustainability of its growing and production practices.

The components of the Whitelatch family's enterprise are presently divided among three legal entities:

- Debtor Claar Cellars LLC owns a winemaking facility, support buildings, inventory, and equipment used to process grapes into wine, store bulk and finished wine, and market bulk and bottled wine to buyers.

- Debtor RC Farms LLC owns several parcels of real property.  Most of the land constitutes vineyards and the remainder is used for various other purposes (including an agricultural pivot circle referred to as the "Circle Ground").  After harvest, RC transfers its grapes to Claar.  Historically, Claar pays RC for the grapes in amounts sufficient to satisfy the expenses RC incurs from its agricultural operations.

- Nondebtor Whitelatch Living Trust, dated March 15, 1995, is a trust formed by Mr. and Mrs. Whitelatch for estate planning purposes.  The trust owns various property, including a parcel of real property containing vineyards farmed by RC as well as a structure that serves as both a residence and shop.

Starting in 2016, the debtors began to finance operations with money borrowed from HomeStreet.  Claar borrowed under a secured line of credit and an equipment loan, both of which are guaranteed by RC, the Whitelatch Living Trust, and Mr. and Mrs. Whitelatch and their two sons individually.  RC borrowed under a term loan; this indebtedness is secured by mortgages on some (but not all) of RC's and the Whitelatch Living Trust's real property and is guaranteed by Claar and the nondebtor individuals guaranteeing the Claar obligations.

The debtors' operations suffered during the period spanning 2016-2019.  Claar's revenues dropped steadily each year, sometimes by more than 30% on a year-over-year basis, and the debtors' tax returns reflect mounting operating losses.  The business declines eventually triggered a breach of financial covenants in the

---

[1]    The White Bluffs region is located north of the City of Pasco and is part of the expansive Columbia Valley American Viticultural Area (AVA) encompassing much of Washington State east of the Cascade Mountains.

HomeStreet credit documents. The business relationship deteriorated further as Claar failed to repay the line of credit upon maturity on September 1, 2019, and the debtors ceased making their respective contractual payments on the equipment and term loans.

In response, HomeStreet accelerated all the indebtedness against all obligors. After this action failed to prompt repayment, HomeStreet sued the obligors in Franklin County Superior Court. Among other relief, HomeStreet sought appointment of a custodial receiver regarding certain property the defendants own. In December 2019, the state court appointed Critical Point Advisors, LLC as custodial receiver regarding the debtors' property and some property held in the Whitelatch Living Trust. In January 2020, the debtors countered by filing the instant chapter 11 petitions. The petitions – filed before effectiveness of the state court's receivership order according to the debtors – invoked the automatic stay and allowed the debtors access to the restructuring powers contained in the Bankruptcy Code. The state-court action remains pending, however, and any applicable provisions of the receivership order became operative against the nondebtor defendants in that action.[2]

These have been active chapter 11 cases featuring many jousts between the debtors and HomeStreet (some of which also involved the unsecured creditors' committee, the receiver, other creditors, and the United States trustee). For purposes of this opinion, significant events include:

- HomeStreet contested the debtors' ability to use HomeStreet's cash collateral, including to make certain proposed postpetition intercompany transfers between the debtors. The court overruled HomeStreet's objection, in part based on RC's agreement to grant HomeStreet adequate protection in the form of a lien on RC's otherwise unencumbered real property.[3]

- The debtors commenced an adversary proceeding against HomeStreet and the state-court receiver seeking a temporary restraining order and permanent injunction to stay litigation against the nondebtor defendants in

---

[2]    There appears to be some disagreement about the precise scope and operation of the receivership order. For instance, during closing argument at the confirmation hearing, separate counsel for Claar and RC took inconsistent positions regarding whether the property held in the Whitelatch Living Trust is encompassed by the receivership order. For present purposes, the court assumes that this property is subject to the receivership order. This court, however, leaves the resolution of that, and any other issues related to the pending state-court action, to the court overseeing that litigation.

[3]    For more details, see *In re Claar Cellars LLC*, 2020 Bankr. LEXIS 682 (Bankr. E.D. Wash. Mar. 13, 2020).

**MEMORANDUM OPINION**                Page 3

HomeStreet's state-court action. To allow the parties to focus on the confirmation process, the court granted, and extended, a stay. The stay expires upon issuance of this opinion.

- Bankruptcy Judge Mary Jo Heston of the Western District of Washington facilitated settlement discussions between the parties to address the possibility of a consensual plan. Despite the efforts of all involved, the discussions failed to achieve the desired result. In connection with this process, the debtors agreed to permit their plan exclusivity period to lapse, which in turn allowed HomeStreet to propose the competing plan at issue here.

- The debtors moved for an order granting RC authority to sell the Circle Ground for approximately $749,000. HomeStreet objected, raising several drafting and technical concerns about the transaction documents. At an August 2020 hearing, the debtors conceded the validity of some stated concerns and agreed to work with the buyer to address the issues. The court indicated that it would sign a sale order without further hearing once the parties resolved the remaining issues. The Circle Ground sale has not been finalized or closed. At the confirmation hearing, debtors' counsel recited the debtors' desire to effectuate this sale pursuant to a bankruptcy plan so that the transaction will "not be taxed under any law imposing a stamp tax or similar tax" pursuant to Bankruptcy Code section 1146(a).[4]

The debtors and HomeStreet ultimately filed and pursued confirmation of their respective plans. This confirmation battle has been contentious and zealously litigated. The parties have disagreed about the contents of their respective disclosure statements, the timing and process for a confirmation hearing, the merits of the respective plans, assorted discovery and evidentiary issues, and other ancillary matters.

The confirmation hearing spanned eight days during which the court admitted numerous exhibits and heard the following testimony:

- **Robert Whitelatch**. Mr. Whitelatch is one of the members and primary manager of the debtors. He provided extensive testimony over several days,

---

[4] *See generally Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 36 (2008) (holding "that § 1146(a)'s stamp-tax exemption does not apply to transfers made before a plan is confirmed under Chapter 11").

including offering an overview and lay valuation of the debtors' different assets, a lengthy history of the debtors' operations from farming to wine sales, and his anticipated future operations and related projections. Mr. Whitelatch further testified about the prices he believes are appropriate for a sale of all the debtors' assets. He explained that he would sell immediately if he obtained these prices but will wait if he does not. Mr. Whitelatch also testified that business might recover within the term of the debtors' plan so as to allow the reorganized debtor to refinance the HomeStreet debt, although he recognized challenges associated with obtaining new financing. On cross examination, Mr. Whitelatch experienced difficulty supporting the optimistic projections associated with the debtors' plan. Overall, the court found Mr. Whitelatch honest and sincere in his testimony, although at times antagonistic toward HomeStreet's counsel. Mr. Whitelatch's commitment to the debtors' cause was evident not only during his testimony, but also by the fact that he and Mrs. Whitelatch attended every day of the confirmation hearing in person.

- **Erik McLaughlin**. Mr. McLaughlin has an extensive background in the wine industry and currently owns and operates a business involved in mergers, acquisitions, and advisory services in the wine industry. Mr. McLaughlin echoed the sentiments expressed by other witnesses that the wine industry has seen a glut of wine grapes in recent years causing an oversupply amplified by decreasing demand. Mr. McLaughlin opined that the market downturn is further exacerbated by Chateau Ste. Michelle's overwhelming influence over Washington's wine industry. Consistent with other witnesses, Mr. McLaughlin further testified that the market downturn will continue until the occurrence of one or a mix of factors that increases demand or decreases supply. Beyond offering his general views about the Washington wine industry, Mr. McLaughlin testified about how he had attempted to intermediate a possible transaction via a letter of intent that Resource Land Holdings negotiated with HomeStreet; this testimony was consistent with that of Mr. Johnson and Mr. Leininger discussed below. Overall, Mr. McLaughlin seemed knowledgeable about the wine industry and sincere in his description of events relating to these bankruptcy cases.[5]

---

[5] The debtors moved to exclude Mr. McLaughlin's testimony on the ground that HomeStreet failed to identify him as a potential witness when responding to a discovery request. Although Mr. McLaughlin's testimony was generally interesting and competent, it addressed issues credibly covered by one or more other witnesses and provided no unique information impacting the court's decision. As such, the debtors' motion regarding Mr. McLaughlin is denied as moot. *See, e.g.*, *Southland Royalty Co. v. Wamsutter LLC (In re Southland Royalty Co.)*, 2020 Bankr. LEXIS 3185, at *61 n.146 (Bankr. D. Del. Nov. 13, 2020).

**MEMORANDUM OPINION**     Page 5

- **Adam Woiblet**.  Mr. Woiblet is a real estate broker who has represented several buyers and sellers in the winery and vineyard industries.  He engaged in discussions with Mr. Whitelatch at several points about being retained to list the debtors' properties.  Mr. Woiblet testified that he and Mr. Whitelatch could not come to an agreement about a listing price, largely because Mr. Woiblet is concerned that Mr. Whitelatch's desired price is too high and could spoil the market for the properties (it also was not clear to Mr. Woiblet or the court the scope of the precise assets subject to the contemplated sale).  On cross examination by HomeStreet, Mr. Woiblet testified that Mr. Whitelatch failed to respond to requests for information related to a sale of the debtors' business as a going concern.  Overall, the court found Mr. Woiblet's testimony sincere and credible.

- **Dr. Allan Busacca**.  Dr. Busacca has extensive academic credentials and experience related to geological evaluation with an emphasis on vineyards and farmland, including being personally involved in the application process for several AVAs in Washington State.  Dr. Busacca performed an evaluation of the debtors' vineyards in October 2020 and provided testimony regarding his impression of the property.  Based on numerous factors, Dr. Busacca is of the view that the quality of Claar Cellars' *terroir*[6] is high, that the site is capable of producing premium wines, and that the property is worth premium prices.  Dr. Busacca focused his assessment on the land itself, however, and did not account for any operational shortcoming.  On cross examination, Dr. Busacca conceded that he is not an appraiser or an economist, that location within an AVA does not independently increase the value of the vineyard, and that the vineyards he used as comparisons generally involve talented and skilled grape farmers.  Overall, the court found Dr. Busacca extremely knowledgeable and enthusiastic about the Washington wine industry generally and the potential associated with the debtors' vineyards more specifically.

- **Mark Johnson**.  Mr. Johnson is a HomeStreet employee who manages troubled loans for the bank.  He testified about the characteristics of the three loans HomeStreet made to the debtors, including the initial extension of credit, collateral, guarantors, and events leading to default.  Mr. Johnson

---

[6]  *Terroir* is a French word that does not readily translate to English.  The word (or perhaps more accurately the concept) encompasses all relevant attributes of a unique site, such as the climate, weather, soil, topography, aspect, bacteria, and any other particular environmental contexts.  *See, e.g., Peoples Super Liquor Stores, Inc. v. Jenkins*, 432 F. Supp. 2d 200, 208 n.3 (D. Mass. 2006).

**MEMORANDUM OPINION**                    Page 6

explained that HomeStreet attempted to work with the debtors after financial difficulties arose, including discussing possible asset sales, but the debtors' inability to repay the debt and unwillingness to sell at what Mr. Johnson deemed reasonable prices devolved to a formal default and the state-court litigation. Mr. Johnson explained how HomeStreet negotiated a nonbinding letter of intent with Resource Land Holdings during the debtors' bankruptcy cases; Mr. Johnson thought the offer fair based on his research regarding valuation. Mr. Johnson expressed skepticism about the debtors' proposed plan for several reasons. Among other concerns, Mr. Johnson stated that Mr. Whitelatch has proposed to sell assets since 2019 but has made no serious moves to do so, that Mr. Whitelatch continues to seek unrealistic prices, and the debtors' proposal to operate until market conditions improve contains unrealistic assumptions – including 400% revenue growth between 2020 and 2025. The court found Mr. Johnson credible and believes he is cautiously approaching the debtors' affairs with a desire to obtain full repayment for his employer.

- **Eric James**. Mr. James is a real estate appraiser with substantial experience appraising wineries and vineyards. Mr. James provided testimony regarding the formal appraisal he performed at HomeStreet's request. Mr. James' testimony included a thorough and extensive explanation for the basis of his assessment of per acre values for the subject property. This valuation included considerations such as market conditions, comparable properties, prior appraisals of the property, types of acreage, quality and number of grapes produced, the debtors' ability to sell product, availability of irrigation water, potential for alternative crops, financial performance, and marketing times. Mr. James asserted that the higher numbers associated with recent public sales of neighboring properties supported, rather than undermined, his assessment because both properties enjoyed a solid demand in the market with longstanding contracts for the purchase of their grapes. Mr. James also provided a critique of earlier appraisals HomeStreet had obtained, which he believes yielded overstated values. Mr. James generally defended his analysis from attacks made by debtors' counsel during cross examination in a measured and detailed fashion. Overall, the court found Mr. James' testimony to be well supported, articulated, and explained.[7]

---

[7] All of Mr. James' testimony focused on the valuation of the debtors' properties, as did much of the testimony of other witnesses. As noted later in this opinion, the court does not make any findings regarding the specific value of the debtors' assets because doing so is not necessary to resolve whether the plans before the court are confirmable. It is clear that the parties have deep and sincere disagreements about valuation, including the appropriate methodology and relevant time horizons, and that this disagreement predates these bankruptcy

- **Brian Birdsall**.  Mr. Birdsall, through Critical Point Advisors, is the state-court receiver and would act as plan agent under HomeStreet's plan.  Mr. Birdsall testified that he would be a fiduciary to all parties involved and that he is required to maximize any available recovery for the debtors and the Whitelatch family.  Mr. Birdsall testified that he would prefer to operate the business and return value to the debtors after repaying creditors.  Mr. Birdsall cited instances where he has done this on prior occasions when acting as a receiver.  Mr. Birdsall described in a manner that revealed his business experience the exact process by which he would evaluate the debtors' situation and determine how to proceed.  He also revealed that he has already started this work.  If a sale became necessary, Mr. Birdsall emphasized that he would consider buyers other than Resource Land Holdings and other avenues, such as an auction, to obtain the best possible price.  Mr. Birdsall testified that he had already looked into the process for obtaining state and federal licenses to sell alcohol; he believes that, absent any impediments caused by the COVID-19 situation, he could have both licenses within approximately sixty days.  Mr. Birdsall also informed the court that he intended to start the application process immediately and would withdraw the application if the court declined to confirm HomeStreet's plan.  Overall, the court found Mr. Birdsall credible and professional and believes he will approach his task as plan agent in a responsible manner.[8]

---

cases.  As with many valuation disputes in bankruptcy cases, the parties now advance their respective views about valuation through the use of experts who (despite their best intentions) usually present opinions that are influenced by the posture of the litigation.  In light of the complexities and dynamics associated with expert-based valuations, some courts have expressed a strong preference for market-driven valuations.  *See, e.g.*, *VFB LLC v. Campbell Soup Co*., 482 F.3d 624, 633 (3d Cir. 2007); *Metlyn Realty Corp. v. Esmark, Inc*., 763 F.2d 826, 835 (7th Cir. 1985); *In re Boston Generating, LLC*, 440 B.R. 302, 325-26 (Bankr. S.D.N.Y. 2010); *see also generally Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. Lasalle St. P'ship*, 526 U.S. 434, 457 (1999) (noting how "it was, after all, one of the [Bankruptcy] Code's innovations to narrow the occasions for courts to make valuation judgments").  At day's end, we will know the true value of the debtors' assets only after the plan agent exposes them to the market.

[8]  As with Mr. McLaughlin, the debtors moved to exclude Mr. Birdsall's testimony on the ground that HomeStreet failed to identify him as a potential witness during the discovery process.  The court denies the debtors' motion based on the absence of prejudice to the debtors in several respects.  First, given the key role Mr. Birdsall occupies as the proposed plan agent, the debtors reasonably could have anticipated that HomeStreet's omission of Mr. Birdsall was an oversight – an oversight HomeStreet corrected when supplying its formal witness list in advance of the confirmation hearing.  Second, the sequencing of witnesses and timing of the confirmation hearing dates allowed the debtors the opportunity to depose Mr. Birdsall prior to his in-court testimony.  Third, debtors' counsel conducted a pointed and professional cross examination of Mr. Birdsall, demonstrating that HomeStreet's omission in the discovery response did not limit the debtors' ability to prosecute their case or result in any "trial by ambush."  *See, e.g.*, *Arcement v. Geovera Specialty Ins.*, 2014 U.S. Dist. LEXIS 203178, at *4-5 (E.D. La. June 10, 2014) (declining to exclude testimony of witness omitted on witness list because omission did not cause plaintiffs to "suffer[] any unavoidable prejudice," including based on some of the same considerations applicable in these cases).

- **B. Joseph Leininger**.  During the confirmation hearing, debtors' counsel offered the videotaped deposition of Mr. Leininger, a partner at Resource Land Holdings.  Mr. Leininger testified that Resource Land Holdings purchases agricultural land in times of oversupply depressing a particular market and resells when the market rebalances.  Mr. Leininger testified that Resource Land Holdings had recently purchased a large vineyard near the debtors' property.  As part of that transaction, Resource Land Holdings also bought associated bare land.  At the suggestion of his consultant Eric McLaughlin, Mr. Leininger explained that Resource Land Holdings offered (via the letter of intent negotiated with HomeStreet) a price based solely on the same bare land price Resource recently paid for the neighboring property.  Mr. Leininger testified that he knew nothing about the debtors' property at the time of the offer, nor did he rely on an appraisal.  Overall, Mr. Leininger's testified credibly and professionally, although at times he appeared bemused at participating in a formal litigation process relating to what he perceived as a "small deal."

After the conclusion of the confirmation hearing, the debtors and HomeStreet filed documents revising their respective plans (or expressing a willingness to do so) to address issues raised during the confirmation hearing.  The parties also submitted substantial post-hearing briefing advancing various arguments why one plan is confirmable while the other is not.

During all the legal combat, the debtors in possession operated their underlying business.  The enterprise suffered several setbacks during 2020, including as a result of the continued glut of wine grapes available in Washington and the cascading effects of the COVID-19 situation.  The consequence has been a marked decline in the debtors' ability to sell bulk or bottled wine.  The debtors missed by wide margins not only their sales projections advanced at the outset of the bankruptcy cases and formulated before the unforeseeable consequences of COVID-19, but also the projections included with their June 2020 disclosure statement.  It is unclear if the debtors could have avoided administrative insolvency absent governmental support received during these cases.  This state of affairs is outside of the control of the Whitelatch family and the debtors, but it does frame the broader reality in which the court evaluates the competing plans.

# DISCUSSION

## *Jurisdiction & Power*

The court has subject matter jurisdiction regarding these bankruptcy cases pursuant to 28 U.S.C. §§ 157(a) & 1334(b) and LCivR 83.5(a) (E.D. Wash.). The parties' dispute regarding confirmation of competing plans is statutorily "core"[9] and "the action at issue stems from the bankruptcy itself."[10] Accordingly, the court may properly exercise the judicial power necessary to finally decide this dispute.

## *Chapter 11 Plan Confirmation Generally*

The apex of many chapter 11 cases is confirmation. A chapter 11 plan provides a detailed framework for how a debtor's assets and liabilities are to be addressed, either through reorganization, liquidation, or a combination of both. Bankruptcy plans vary in length and complexity; chapter 11 can operate as a tool to address simple overleverage as well as to resolve some of the world's most difficult and complex business and legal issues.

The exact features of the plan in any given chapter 11 case are nearly boundless – the plan process is deliberately flexible and can accommodate a panoply of resolutions, including comprehensive global settlements and nonconsensual "cramdown" arrangements. At the same time, however, there are rules to the game; the Bankruptcy Code contains guardrails shaping the outer limits of what a plan may do – these limits provide a background context that can prompt negotiated resolutions and are the legal principles bankruptcy courts must apply to resolve contested confirmations.

The specific requirements regarding confirmation of a plan are detailed in Bankruptcy Code section 1129. Because those requirements incorporate other provisions of the Bankruptcy Code, the entirety of the statutory scheme may be at play during the plan process. The plan proponent must demonstrate by a preponderance of the evidence that its plan satisfies all confirmation requirements.[11] In addition to resolving confirmation objections, bankruptcy

---

[9] *See* 28 U.S.C. § 157(b)(2)(L).

[10] *Stern v. Marshall*, 564 U.S. 462, 499 (2011).

[11] *E.g.*, *United States ex rel. Farmers Home Admin. v. Arnold & Baker Farms (In re Arnold & Baker Farms)*, 177 B.R. 648, 654-55 (B.A.P. 9th Cir. 1994), *aff'd*, 85 F.3d 1415 (9th Cir. 1996); *In re Internet Navigator Inc.*, 289 B.R. 128, 131 (Bankr. N.D. Iowa 2003).

courts have an independent duty to review and determine the legality of a plan's contents.[12]

With this background in mind, the court turns to the details of the two proposed plans.

### *Analysis of the Debtors' Plan*

In broad strokes, the debtors' plan is built around aggregation of the three components of Claar's operations. The plan proposes to merge Claar and RC into a single reorganized debtor, revoke the Whitelatch Living Trust and contribute the real property now farmed by RC to the reorganized debtor, and permit the reorganized debtor to continue to operate through December 2025. Over this roughly five-year period, the plan promises to pay all creditors in full with interest. The plan also proposes to reamortize the HomeStreet debt over twenty-five years with annual payments in the reamortized amounts due in each of the first four years and the remaining amount due in a "balloon" payment in 2025; general unsecured creditors are to receive five equal annual payments during the same period. The source of the promised payments is uncertain, with the plan reserving optionality to fund the creditors' payments from operations, refinancing, or sale.

Further details of the debtors' plan are discussed below in the context of specific objections raised by HomeStreet.

I.    The Debtors' Proposed Plan Satisfies Section 1129(a)(3)

Bankruptcy Code section 1129(a)(3) requires that a "plan has been proposed in good faith and not by any means forbidden by law." The Ninth Circuit Court of Appeals recently limited section 1129(a)(3)'s reach "only to the proposal of a plan, not the terms of the plan."[13] Section 1129(a)(3)'s focus is thus on the plan proponent's actions specifically related to the plan proposal process, rather than whatever actions might occur pursuant to the plan itself or the proponent's behavior during the bankruptcy case more generally.[14]

---

[12] *See, e.g.*, *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 276-78 (2010); *Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650, 653 (9th Cir. 1997); *Everett v. Perez (In re Perez)*, 30 F.3d 1209, 1213-14 (9th Cir. 1994).

[13] *Garvin v. Cook Invs. NW, SPNWY, LLC*, 922 F.3d 1031, 1035 (9th Cir. 2019).

[14] *See id.* at 1036 n.3 and the cases cited therein; *see also In re Juarez*, 2020 U.S. App. LEXIS 39677, at *4 (9th Cir. Dec. 17, 2020) ("The focus under § 1129(a)(3) is limited to the manner of the plan's *proposal*, not on a

HomeStreet argues that the debtors' plan does not satisfy section 1129(a)(3) for several reasons, including because provisions of the plan are impermissible, the debtors vacillated on various issue (including the value of wine marked for destruction prior to the confirmation hearing), and the debtors are manipulating the timing of the Circle Ground sale.

Despite HomeStreet's contentions, the court concludes that the debtors' proposed their plan in good faith and not by any unlawful means. None of the issues HomeStreet raises relates to the debtors' *proposal* of their plan, as opposed to the contents of that plan or broader events during these bankruptcy cases. Moreover, the plan attempts to reorganize the debtors' operations so the Whitelatch family can retain what they believe is significant equity in the debtors' properties while also proposing to repay all creditors in full.[15]  Based on the totality of the circumstances, the debtors' proposal of the plan is not a litigation tactic, effort to abuse the bankruptcy process, or tainted by illegality. The debtors and the Whitelatch family are working within the framework of a complex bankruptcy process to achieve a result consistent with the objectives and purposes of the statute – rehabilitation and maximization of a family-owned business while providing a fair recovery for creditors. Although the plan is not confirmable for other reasons, the debtors proposed their plan for legitimate and honest purposes. As a result, the debtors have satisfied the requirement in section 1129(a)(3).

## II.    The Debtors' Proposed Plan Does Not Satisfy Section 1129(a)(1)

Bankruptcy Code section 1129(a)(1) requires that a "plan complies with the applicable provisions" elsewhere in the Bankruptcy Code. This requirement may incorporate various sections of the statute depending on the details of a given case or plan, but sections 1122 and 1123 are universally applicable. Respectively, these sections address the manner in which a plan may classify claims and the mandatory and permissive features of a plan. If a proposed plan omits section 1123 requirements or infringes on proscriptions in that section or elsewhere in the Bankruptcy Code, then section 1129(a)(1) prohibits confirmation. The debtors' plan is problematic for both reasons.

---

debtor's allegedly bad faith activities unrelated to plan proposal, because § 1129(a)(3) does not require that a plan comply with all applicable law." (internal quotation marks omitted)).

[15]    *Cf. Garvin*, 922 F.3d at 1036 n.3 ("Here, the Amended Plan provides for the creditors' repayment and the debtors' ongoing operations, so it is consistent with the objectives and purpose of the Bankruptcy Code.").

**MEMORANDUM OPINION**                    Page 12

## A. The Debtors' Proposed Plan Does Not Satisfy Section 1123(a)

Bankruptcy Code section 1123(a) details eight requirements chapter 11 plans must accomplish – though not all are relevant in every case. HomeStreet argues that the debtors' plan does not comply with the fifth mandate. The court agrees.

Section 1123(a)(5) requires that a plan "provide adequate means for the plan's implementation." The remainder of the provision sets forth a nonexclusive list of "means" that may implement a plan. While this list is not limiting, it is crucial to keep in mind the qualitative requirement in the provision – the proposed means of implementation must be "adequate." This word is not defined in the Bankruptcy Code but has an ordinary usage and thus "means 'sufficient,' 'commensurate,' or 'equal to what is required.'"[16] Therefore, section 1123(a)(5) requires that the plan specify means sufficient to allow all terms, including whatever creditor payments are proposed in the plan, to be completed.[17]

Applying these tenets here shows that the debtors' plan does not include means adequate for its implementation. The plan does state that creditors will receive payments via funds from operations, asset sales, or future refinancing. Yet the plan omits details explaining when and which option will be selected and the process for executing the chosen option. The debtors have submitted five-year operational projections (discussed later), but if those projections prove unattainable, the plan contains no trigger requiring the reorganized debtor to shift course, no firm milestones for commencing or completing a sale or refinancing, and no range of sale or refinancing terms to which the reorganized debtor is bound. In essence, the debtors' plan provides the reorganized debtor a five-year runway and near boundless latitude to adopt and execute a strategy to fully repay creditors from illiquid assets. In exchange, creditors, particularly HomeStreet, receive the proverbial "hope certificate" that everything will proceed as promised.[18] This lack of detail and lack of firm processes that could constitute adequate means for the plan's implementation renders it unconfirmable.[19]

---

[16] *Irving Tanning Co. v. Me. Superintendent of Ins. (In re Irving Tanning Co.)*, 496 B.R. 644, 664 (B.A.P. 1st Cir. 2013) (quoting BLACK'S LAW DICTIONARY (6th ed. 1990)).

[17] *See, e.g.*, *In re Stuart Glass & Mirror, Inc*., 71 B.R. 332, 334 (Bankr. S.D. Fla. 1987).

[18] The court notes that the debtors appear to have proposed their plan in good faith based on Mr. Whitelatch's obvious and sincere belief in the value of the debtors' operations and assets and his understandable hesitancy to sell at what he perceives to be a low point in the market. Although these views standing alone may satisfy the good-faith requirement, they do not necessarily satisfy other confirmation requirements.

[19] *See, e.g.*, *Crestar Bank v. Walker (In re Walker)*, 165 B.R. 994, 1001-04 (E.D. Va. 1994) (determining that plan lacked adequate means for its implementation when it provided debtors with additional time and flexibility to

**MEMORANDUM OPINION**                    Page 13

The indeterminacy of the debtors' plan similarly runs afoul of section 1123(a)(3)'s mandate that the plan must "***specify*** the treatment of any class of claims or interests that is impaired under the plan" (emphasis added). The word "specify" requires a plan to contain clear and concrete descriptions for the treatment of impaired classes.[20] The debtors' plan generally states that the reorganized debtor will repay HomeStreet within a five-year timeframe. For the same reasons discussed above, however, the plan ignores the details needed to pave a path to such a result. Again, HomeStreet is promised an outcome but left in the dark about how the reorganized debtor will achieve that outcome, and HomeStreet has understandable doubts regarding the viability of the promise. The high degree of uncertainty for HomeStreet – the flipside of the substantial flexibility reserved for the debtors – associated with the debtors' plan ultimately is inconsistent with the specificity required by section 1123(a)(3) and (5).

## B.   The Debtors' Proposed Plan Includes Prohibited Content

Bankruptcy Code section 524(e) provides that, subject to a narrow exception, "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." As the Ninth Circuit Court of Appeals recently reiterated, section 524(e) "prevents a reorganization plan from inappropriately circumscribing a creditor's claims against a debtor's co-debtor or guarantors over the discharged debt."[21] Put differently, section 524(e) precludes a co-obligor of a bankrupt debtor from piggybacking on rights the debtor enjoys under the Bankruptcy Code, including the right to

---

choose a strategy but included minimal details about alternatives; explaining how "it is important for a plan of reorganization to make reasonably specific provisions for an adequate means of implementation because speculative, indefinite plans will necessitate objections by the creditors who have no reasonable means by which to assess whether a plan can achieve the results contemplated by the Code, and because the courts will have no objective criteria by which to make confirmation judgments"); *In re Star Ambulance Serv., LLC*, 540 B.R. 251, 261 (Bankr. S.D. Tex. 2015) (concluding that plan failed to satisfy section 1123(a)(5) because it provided only general goals to generate funds "but provides no details as to how these goals will be accomplished" and did not include sufficiently substantive provisions to facilitate implementation); *In re Hawkins*, 2013 Bankr. LEXIS 709, at *6-9 (Bankr. D.S.C. Feb. 22, 2013) (declining to confirm plan based on, among other reasons, the absence of adequate means of implementation stemming from the plan's lack of a firm timeline and milestones, along with "the plan's vesting in Debtor of almost unfettered discretion regarding how to market and what price to accept"); *In re Valley Park Grp., Inc*., 96 B.R. 16, 23 (Bankr. N.D.N.Y. 1989) (holding that plan did not include adequate means of implementation when there was not evidence of specific acts that would "substantiate [the debtor's] optimistic analyses" and provide confidence that the business operations and asset sales proposed by the plan would succeed).

20   *See, e.g.*, *Sandy Ridge Dev. Corp. v. La. Nat'l Bank (In re Sandy Ridge Dev. Corp.)*, 881 F.2d 1346, 1352-53 (5th Cir. 1989); *In re Butler*, 42 B.R. 777, 780 (Bankr. E.D. Ark. 1984); *In re Huckabee Auto Co*., 33 B.R. 132, 136-37 (Bankr. M.D. Ga. 1981).

21   *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1083 (9th Cir. 2020).

discharge or restructure indebtedness.[22]  If a co-obligor seeks a discharge or to restructure its liability on a jointly liable claim, section 524(e) effectively requires the co-obligor to commence its own bankruptcy case.

The debtors' plan violates section 524(e) in two respects.  First, the debtors' plan provides that the reorganized debtor's "obligations to HomeStreet shall continue to be supported by the personal guaranties" of the Whitelatch family members who guaranteed the debtors' obligations.  The effect of this provision is to alter the terms on which these nondebtors are liable to HomeStreet – the *reorganized debtor's* obligations are extended and modified pursuant to the plan's proposed treatment of HomeStreet's claims, but HomeStreet accelerated the *debtors'* obligations in 2019.  The guarantors signed a Commercial Guaranty providing that they incurred absolute, unconditional, unlimited, and continuing obligations while waiving "any and all rights or defenses based on . . . any disability or other defense of Borrower . . . or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness" (the word "Indebtedness" is defined in exceptionally broad fashion to capture anything Claar or RC may owe HomeStreet as Borrower even if some component is "barred or unenforceable against Borrower for any reason whatsoever").[23]  The debtors' plan's de facto restructuring of nondebtors' liability to HomeStreet thus runs afoul of section 524(e) and prevents confirmation absent HomeStreet's consent.[24]

Second, the debtors' plan impermissibly shields "the property of any other entity" from HomeStreet.  The plan's proposed transfer of property held in the

---

[22]  Section 524(e) pulls forward a principle applicable under prior iterations of United States bankruptcy law.  *See, e.g.*, *Myers v. Int'l Tr. Co.*, 273 U.S. 380, 383-85 (1927) (concluding that composition of a partnership under the 1898 Bankruptcy Act discharged the partnership as the maker of a note, but not the individual partners who endorsed the note); *Abendroth v. Van Dolsen*, 131 U.S. 66, 71-74 (1889) (precluding special partner from limiting his liability or obtaining a stay of litigation against him as a result of underlying firm's bankruptcy case); *Hill v. Harding*, 130 U.S. 699, 703-04 (1889) (determining that debtor's bankruptcy proceeding did not bar a creditor from obtaining judgment and then enforcing it against a surety bond provider); *Wolf v. Stix*, 99 U.S. (9 Otto) 1, 8-10 (1879) (holding that debtor's discharge in bankruptcy did not release or discharge his sureties).

[23]  *See* HomeStreet Bank's Ex. 49 at pp. 17-18, 25-26, 29-30, 33-34.

[24]  *See, e.g.*, *United States v. Stribling Flying Serv., Inc.*, 734 F.2d 221, 223 (5th Cir. 1984) (affirming "determination of the district court that the obligation of the Kimballs, as unconditional guarantors of the corporate obligation to pay its Small Business Administration loan in full, was not affected by confirmation of the reorganization plan by which the corporate debt was restructured and reduced" based on section 524(e)); *R.I.D.C. Indus. Dev. Fund v. Snyder*, 539 F.2d 487, 490 n.3 (5th Cir. 1976) ("The bankruptcy court can affect only the relationships of debtors and creditor.  It has no power to affect the obligations of guarantors." (cited and quoted in *Underhill v. Royal*, 769 F.2d 1426, 1432 (9th Cir. 1985))).

**MEMORANDUM OPINION**            Page 15

Whitelatch Living Trust to the reorganized debtor would have the effect of shielding nondebtor property from whatever rights and remedies HomeStreet might otherwise have against that property, including in connection with the pending state-court action.[25]  Such an effect extends bankruptcy rights to the Whitelatch Living Trust that are otherwise unobtainable – treatment section 524(e) prohibits.[26]

### III.    The Debtors' Proposed Plan Does Not Satisfy Section 1129(a)(11)

Bankruptcy Code section 1129(a)(11) requires that plan confirmation be "not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."

This requirement is commonly called the "feasibility" test and "requires the debtor to demonstrate that the plan has a reasonable probability of success."[27]  This is not an overly-demanding standard; a "reasonable probability" is akin to a preponderance standard (i.e., 51%+) and case law is clear that a plan's success

---

[25]  HomeStreet raises this issue in its briefing but frames it somewhat differently.  According to HomeStreet, the debtors' plan creates "a collection injunction in perpetuity" regarding the Whitelatch Living Trust property, which means the plan violates section 1129(a)(3) under the reasoning of *Elite of L.A., Inc. v. Hamilton (In re Hamilton)*, 2018 Bankr. LEXIS 2269 (B.A.P. 9th Cir. July 31, 2018), *aff'd*, 803 F. App'x 123 (9th Cir. 2020).  The broad approach taken by the BAP in *Hamilton* (which included an analysis of the content and effects of the debtor's plan) is inconsistent with the more limited scope that the Ninth Circuit Court of Appeals later ascribed to section 1129(a)(3) in *Garvin v. Cook Investments*.  In any event, the court believes the plan's proposed treatment of the property owned by the Whitelatch Living Trust was done in an honest effort to holistically address matters with HomeStreet (although HomeStreet correctly observes that there has been some vacillation and perhaps inconsistency in the debtors' position regarding the importance of the trust property to their reorganization efforts).  Nevertheless, the underlying concern raised by HomeStreet – that the debtors' plan effectively imposes a "collection injunction" shielding nondebtor property – is a legitimate one.  *See, e.g.*, *American Hardwoods, Inc. v. Deutsche Credit Corp. (In re American Hardwoods, Inc.)*, 885 F.2d 621, 625-27 (9th Cir. 1989) (holding that bankruptcy courts lack jurisdiction and power to enjoin creditors' collection rights against nondebtors after a plan has been confirmed).

[26]  *See, e.g.*, *In re Keller*, 157 B.R. 680, 685-86 (Bankr. E.D. Wash. 1993) (Rossmeissl, J.) (concluding that chapter 11 plan violated section 524(e) and could not be confirmed based on its requirement that a security interest against nondebtor property be released; explaining that "[f]or purposes of compliance with § 524(e), a plan which compels a creditor to release liens against properties of non-debtors is indistinguishable from a plan which forces a creditor to release guarantors from their personal liability").

[27]  *First S. Nat'l Bank v. Sunnyslope Hous. L.P. (In re Sunnyslope Hous. L.P.)*, 859 F.3d 637, 646-47 (9th Cir. 2017) (en banc) (internal quotation marks omitted); *see also, e.g.*, 7 COLLIER ON BANKRUPTCY ¶ 1129.02[11] (16th ed. rev. 2020).  In fact, prior law under the 1898 Bankruptcy Act included an express statutory requirement that plans be "feasible."  As under current law, this was a case-specific inquiry requiring judicial consideration not only of capital structure issues, but also regarding go-forward operational concerns, such as whether the plan could reconfigure "a business that has been out of step with modern trends."  *See Gen. Stores Corp. v. Shlensky*, 350 U.S. 462, 467-68 (1956) (Douglas, J.).

**MEMORANDUM OPINION**           Page 16

need not be ensured.[28]  At the same time, "establishing feasibility requires more than a promise, hope, or unsubstantiated prospect of success."[29]  Thus, a bankruptcy court must adopt a level-headed approach and evaluate the plan's chances based on objective facts.[30]  Although the court need not view a debtor's future cynically, measured realism is warranted since "[o]ne purpose of the feasibility test is to weed out plans that promise more than debtors can deliver."[31]

Case law provides amplifications of relevant principles underlying section 1129(a)(11):

- "The court must be reasonably satisfied that the business is likely to perform in the real would [sic] as well as the proponent projects it will in the courtroom.  Once reorganized, the business must be able to be economically viable under the repayment provisions of the plan.  Where the financial realities do not accord with the proponent's projections or where the proposed assumptions are unreasonable, the plan should not be confirmed."[32]

---

[28] *See, e.g.*, *In re N. Valley Mall, LLC*, 432 B.R. 825, 838 (Bankr. C.D. Cal. 2010) ("The Code does not require debtor to prove that success is inevitable or assured, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility.  The Court finds that the plan more likely than not can be performed as promised and that it is therefore feasible and complies with § 1129(a)(11)." (citations omitted)).

[29] *In re Diplomat Constr., Inc.*, 2009 Bankr. LEXIS 4250, at *6 (Bankr. N.D. Ga. Nov. 20, 2009).  *See also, e.g.*, *United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990) (noting how section 1129(a)(11) "requires a bankruptcy court to assure itself that reorganization will succeed"); *In re Repurchase Corp.*, 332 B.R. 336, 342 (Bankr. N.D. Ill. 2005) ("[I]f metaphysical possibility of feasibility were sufficient, judges would be obligated to trade their robes for crystal balls.").

[30] *See, e.g.*, *Clarkson v. Cook Sales & Serv. Co. (In re Clarkson)*, 767 F.2d 417, 420 (8th Cir. 1985) ("Although we sympathize with the [debtors], we find that the feasibility test is firmly rooted in predictions based on objective fact."); *Chase Manhattan Mortg. & Realty Tr. v. Bergman (In re Bergman)*, 585 F.2d 1171, 1179 (2d Cir. 1978) ("Under the test of feasibility, the court 'views the probability of actual performance of the provisions of the plan. Sincerity, honesty, and willingness are not sufficient to make the plan feasible, and neither are any visionary promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts.'" (quoting volume 9 of what was likely the fourteenth edition of Collier on Bankruptcy, although the opinion's citation is unclear)); *In re Howard*, 212 B.R. 864, 879 (Bankr. E.D. Tenn. 1997) ("[M]any courts give debtors the benefit of the doubt on the issue of feasibility provided a reasonable probability of success is established.  Feasibility, however, must be based on objective facts rather than wishful thinking." (citations omitted)).

[31] *In re CRB Partners, LLC*, 2013 Bankr. LEXIS 800, at *23 (Bankr. W.D. Tex. Mar. 4, 2013).

[32] *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 507 (Bankr. S.D. Tex. 1989).  *See also, e.g.*, *F.H. Partners, L.P. v. Inv. Co. of the Sw. (In re Inv. Co. of the Sw.)*, 341 B.R. 298, 311 (B.A.P. 10th Cir. 2006) ("When determining whether a plan is feasible, courts often consider a debtor's cash flow projections showing its ability to simultaneously make plan payments and fund projected operations.  The projections must be based upon evidence of financial progress and must not be speculative, conjectural, or unrealistic.").

**MEMORANDUM OPINION**       Page 17

- "[C]ourts have refused to confirm plans whose feasibility turned on future sales of property, or future refinancings, absent an adequate showing that such sales or refinancings would be likely to occur."[33]

- "Plans which extensively rely on sale or refinance of real property that constitutes a debtor's primary or sole significant asset, and where that asset has been a marginal performer to date, are inherently speculative and invite close judicial scrutiny of the assumptions underlying the plan."[34]

This court agrees that such unsubstantiated provisions fail to establish feasibility and, on this basis, cannot find that the debtors' plan satisfies section 1129(a)(11). To begin, the plan's projection that the debtors' revenues will increase significantly between now and 2025 is overly optimistic. These projections are based entirely on reversion to revenues generated in 2013 and 2014. However, much has changed in the industry since then and Claar's revenues have rapidly, consistently, and significantly trended downward during the last five years. And Claar's steeper and unpredicted decline in 2020 reveals that the trend continues undiminished and exposes shortcomings in the debtors' projections.

The record does contain instances warranting cautious optimism – such as the possibility that the COVID-19 situation will abate eventually and restaurant demand will return to pre-COVID-19 levels, the likely establishment of White Bluffs as a standalone AVA, and the potential mitigation of the current glut associated with possible smoke taint of California's and Oregon's 2020 grape crops. Whether these events will occur or ultimately materially benefit the debtors' revenues are presently open questions. Unfortunately, the record contains abundant evidence supporting a more pessimistic perspective. For example, a Silicon Valley Bank analysis suggests that the wine market may prove equally or more difficult in 2021 and multiple witnesses testified that the early stages of a

---

[33] *In re Las Vegas Monorail Co.*, 462 B.R. 795, 800 (Bankr. D. Nev. 2011). *See also, e.g., In re Walker*, 165 B.R. at 1005 ("Without knowing the terms of the proposed sales of [certain] property, and without knowing the specific timeframe for the proposed sale, and without articulation of a schedule and a plan for the liquidation of other properties in the event that the sale of the . . . property fails to yield sufficient funding, it is impossible for a court to find that there will be no need for further financial reorganization or indeed liquidation of the Bankruptcy Estate.").

[34] *In re Invs. Fla. Aggressive Growth Fund*, 168 B.R. 760, 765 (Bankr. N.D. Fla. 1994). *See also, e.g., id.* at 766 ("While a proponent need not demonstrate the success of the plan with absolute certainty, more than simple optimism about future market conditions is needed to support the confirmation of a plan whose success depends on a future sale or refinance of the debtor's principal asset."); *In re Lakeside Global II, Ltd.*, 116 B.R. at 510 (noting that the feasibility test "does require some persuasion that in all likelihood there is a reasonable probability of a sale or refinancing in a commercial market within the time period contemplated by the plan").

correction to the Washington wine market are still years away. Although the court does not doubt the sincerity of Mr. Whitelatch's beliefs that he can restore the debtors' operations to prior levels or the courage of his convictions that the market bottomed in 2020 and will quickly improve, the record simply does not provide an objective foundation on which the court can find this outcome reasonably likely.[35] Because the plan projections are unduly optimistic and unrealistic given the debtors' recent performance and the current state of affairs, those projections cannot establish a reasonable probability that the debtors' plan will succeed.[36]

Additionally, as already discussed, the plan's reliance on a possible sale or refinance is not supported by a sufficient showing that such events are likely to happen. Absent a rapid improvement in operations, Claar simply does not generate sufficient cash to service the debt necessary to consummate a refinancing. Even if there is significant operational improvement, a new lender would likely be reluctant to lend until the business stabilizes and shows the improvement is sustained. The record contains no evidence of a possible refinancing counterparty, including indications of interest, term sheets, or the like. Instead, Mr. Whitelatch's testimony predictably reflects the debtors' inability to obtain new financing as well as Mr. Whitelatch's recognition that a few years of improved performance is necessary before refinancing may be viable.

Similarly, the record and the plan terms instill insufficient confidence that a sale is likely to occur. The debtors sought court approval to retain Mr. Woiblet as a broker several months ago but have not finalized that arrangement. The court learned that this stasis is largely because Mr. Woiblet believes that Mr. Whitelatch's desired listing price is too high. Thus, at present, no broker has been retained, no property has been listed, and no potential buyer has been identified. More problematic is that the plan contains no milestones, benchmarks, or mechanisms to ensure a sale actually occurs before 2025. There is no "drop dead" date, deadline to begin the marketing process, or price range requiring the consummation of a sale. Instead, the plan provides the reorganized debtor with unbridled discretion about when, and if, to begin any sales process and whether to actually accept any offer. In the end, there is no evidence of a buyer willing to buy

---

[35] *Cf. In re Trenton Ridge Invs.*, 461 B.R. 440, 486 (Bankr. S.D. Ohio 2011) (finding that plan was not feasible, including because it was not reasonably probable that the debtor "will be able to bridge the gap between its actual historical performance and its projections for the first five years of the Plans").

[36] While cross examining several HomeStreet witnesses who provided a view of the market and the value of the debtors' assets contrary to Mr. Whitelatch's, debtors' counsel emphasized that such witnesses are not appraisers or economists and hence unqualified to offer such opinions. The court notes that this logic necessarily applies to Mr. Whitelatch's estimations of value and his market predictions as counsel presented no evidence that Mr. Whitelatch is specially qualified to render such opinions.

**MEMORANDUM OPINION**          Page 19

at the price at which Mr. Whitelatch is willing to sell.  And there is no objective reason to anticipate that such a buyer will emerge or that the market will align with Mr. Whitelatch's subjective expectations within a timeline consistent with the plan's term (and it is always possible that the market could get worse, causing realizable value to decline).  As such, the court is unable to conclude that it is more likely than not that the desired sale will materialize.

Finally, it is notable that the six-factor test sometimes used in a section 1129(a)(11) analysis weighs against the debtors.  This test sets forth the following factors: (1) the adequacy of the debtor's capital structure; (2) the earning power of its business; (3) economic conditions; (4) the ability of the debtor's management; (5) the probability of the continuation of the same management; and (6) any related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[37]

First, although the debtors may be balance-sheet solvent, they are cash-flow insolvent.  Their capital structure has more debt than the debtors are capable of servicing on a normal amortization.  The plan does not remedy this problem by reducing the amount of any indebtedness, but simply defers repayment of most of it through a five-year balloon payment.  Second, as discussed above, there is no way to determine when or if the debtors can revive their business to its former positive earning power.  Third, for the several reasons already discussed, economic conditions presently disfavor the debtors.  Fourth, the Whitelatch family has not been able to remedy the detrimental impact of these conditions.  Fifth, the Whitelatch family will continue managing the reorganized debtor under the debtors' proposed plan.  Finally, and as also discussed, the debtors have provided no details or evidence indicating that the ability to perform under the plan as a practical matter.[38]  The application of this test underscores the court's determination that the debtors have not demonstrated by a preponderance of the evidence that their plan has a reasonable probability of success.

---

[37] *See, e.g.*, *In re Las Vegas Monorail Co.*, 462 B.R. at 802.

[38] *Cf. In re Geijsel*, 480 B.R. 238, 273-74 (Bankr. N.D. Tex. 2012) (after acknowledging that the ability of the debtors' principals to run their business "cannot seriously be questioned" and that the principals had a deep understanding of their business as a result of devoting "their entire adult lives" to the enterprise, nevertheless finding that the plan was not feasible because "[i]t is nothing more than speculation to consider whether the Debtors can refinance their operations or sell assets as a way to" perform their obligations under a plan).

**MEMORANDUM OPINION**       Page 20

## IV.    The Debtors' Proposed Plan Does Not Satisfy Section 1129(a)(16)

Bankruptcy Code section 1129(a)(16) requires that any transfer of property under a plan must "be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust."[39]  Thus, a plan's proposed transfer of property held by an entity falling within this description must comply with applicable nonbankruptcy law.

Section 1129(a)(16) implicates the Whitelatch Living Trust, which is a personal trust established for estate planning purposes.  Case law makes clear that family trusts of this sort are not business trusts[40] and the court has found no authority suggesting a different analysis would apply to the similar adjectives "moneyed" or "commercial."  As a result, the plan may not propose transfers of property held in the Whitelatch Living Trust unless permissible under Washington law.[41]

HomeStreet argues, and the court agrees, that Washington law prohibits the proposed transfer in light of the pending receivership proceeding.  A receiver appointed by a Washington state court holds the subject property *in custodia legis*

---

[39]   The legislative history associated with section 1129(a)(16)'s addition to the Bankruptcy Code suggests that the drafters were concerned with regulating transfers of property by nonprofit entities.  *See* 7 COLLIER ON BANKRUPTCY ¶ 1129.02[16] (16th ed. rev. 2020).  Despite this apparent focus, Congress declined to limit the provision in such a way.  Section 1129(a)(16) contains no language that could be read to impose a nonprofit limitation.  The absence is telling when section 1129(a)(16) is juxtaposed with section 541(f) (both of which were added to the statute in 2005 in the same section of the same legislation).  The latter includes an express reference to "a corporation described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Code."  This textual juxtaposition demonstrates that Congress knew how to, and did, impose a nonprofit limitation but omitted any such limitation in section 1129(a)(16).  *See, e.g.*, *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 537 (1994) ("It is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another." (internal quotation marks omitted)).

[40]   *See, e.g.*, *In re Blanche Zwerdling Revocable Living Tr.*, 531 B.R. 537, 545-46 (Bankr. D.N.J. 2015); *In re Hughes Living Tr.*, 305 B.R. 59, 61-62 (Bankr. W.D. Okla. 2004); *In re Sung Soo Rim Irrevocable Intervivos Tr.*, 177 B.R. 673, 678 (Bankr. C.D. Cal. 1995); *In re Westgate Vill. Realty Tr.*, 156 B.R. 363, 365 n.1 (Bankr. D.N.H. 1993).

[41]   At closing argument, the court inquired whether the preemptive language in Bankruptcy Code section 1123(a) would allow the debtors to propose contribution of the Whitelatch Living Trust property as a means of implementing the plan notwithstanding any otherwise applicable prohibition under Washington law.  The court ultimately does not need to, and thus does not, address the scope of preemption under section 1123(a) because whatever preemptive effect that generalized provision has must yield to the more specific command in section 1129(a)(16).  *See, e.g.*, *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

---

**MEMORANDUM OPINION**                    Page 21

and as an "arm" of the appointing court.[42]  In a manner not dissimilar to a bankruptcy case involving a chapter 7 or 11 trustee, a receivership order places a specified *res* within the jurisdiction and power of the state court and vests the receiver with control over that *res*.  Although the debtors cite general authority permitting a trustor to revoke a Washington trust, they cite none allowing such a revocation to extricate former trust property from a pending receivership proceeding.  Such a result would create an extraordinary end run around the *in custodia legis* status of property subject to a receivership order.  Moreover, as HomeStreet notes, RCW 11.98.070(12) and (18) authorize trusts to incur debts that are secured by the trust estate (Article 17, Section 3.k. of the Whitelatch Living Trust documentation expressly authorizes the same[43]).  Nothing in RCW 11.98.070 or any other law cited by the debtors permits revocation of a trust in a fashion that negates an intervening lender's claims and interests related to assets willingly encumbered by the trust.  Again, such a result would create an end run around creditor rights otherwise specifically recognized by Washington law and in the process create significant commercial uncertainty.  Absent authority specifically permitting a pending receivership proceeding and a secured creditor's rights to be circumvented in the manner proposed, the court cannot conclude that such a transfer will "be made in accordance with any applicable provisions of nonbankruptcy law" as section 1129(a)(16) requires.  As such, the proposed transfer of the Whitelatch Living Trust property to the reorganized debtor also precludes confirmation of the debtors' plan.[44]

---

[42]  *See, e.g.*, *Morse Electro Prods. Corp. v. Benefit Indus. Loan Co.*, 90 Wn.2d 195, 201 (1978); *Yakima Fin. Corp. v. Thompson*, 171 Wash. 309, 313 (1933).

[43]  *See* HomeStreet Bank's Ex. 39 at p. 18.

[44]  During closing argument and post-hearing briefing, the debtors indicated a willingness to amend their plan to eliminate this aspect if the court ultimately concludes it is impermissible.  Any bankruptcy plan proposed to the court is ultimately one controlled by the proponent – the court has no power or desire to dictate plan terms to any debtor or other party in interest and can only pass on the legality of a plan that has in fact been proposed by a debtor or other permitted proponent.  The court does not decide whether an amendment similar to what has been suggested by the debtors would be sufficiently material to require resolicitation of a further amended plan (because that would be an advisory opinion), but even if it were allowed, such an amendment would not resolve all bases rendering the debtors' plan unconfirmable.

**MEMORANDUM OPINION**                    Page 22

V.    Summary Regarding the Debtors' Proposed Plan

Although proposed in good faith, the debtors' plan does not satisfy multiple requirements under Bankruptcy Code section 1129(a) for the reasons set forth above. As such, the court cannot confirm the plan.[45]

## Analysis of the HomeStreet Plan

The crux of HomeStreet's plan is appointment of a plan agent to assume control of the debtors' operations and assets. Under the continued supervision of this court, the plan agent would evaluate matters and then proceed to monetize the debtors' assets for distribution in accordance with the Bankruptcy Code's priorities. The process will be intended to maximize value for all stakeholders, including the Whitelatch family as residual claimants, and subject to notice and opportunity for objecting parties to be heard. The HomeStreet plan proposes to work in tandem with the pending receivership proceeding.[46]

The court discusses further details of HomeStreet's plan below in the context of specific objections raised by the debtors.

I.    HomeStreet's Proposed Plan Satisfies Section 1129(a)(3)

Bankruptcy Code section 1129(a)(3) requires that a "plan has been proposed in good faith and not by any means forbidden by law." As discussed above, binding Ninth Circuit precedent limits the scope of section 1129(a)(3) to the process of **proposing** a plan, not the substantive contents of the plan.

The debtors contend that HomeStreet filed its plan in bad faith for assorted reasons. As with arguments HomeStreet makes against the debtors' plan, some of the debtors' arguments are directed toward the substance of the plan or conduct

---

[45]    Because the issues addressed in this opinion are sufficient reasons why the debtors' plan is not confirmable, the court need not, and hence does not, address various other arguments HomeStreet makes to advance the same conclusion (including arguments about Bankruptcy Code section 1129(a)(4) and (5), about whether the debtors' proposed plan modifications to address the Baker Boyer Bank objection are material and require resolicitation, and about whether the treatment of HomeStreet's claims in the debtors' plan violates Bankruptcy Code section 1129(b)). *See, e.g., Turner v. United States Parole Comm'n*, 810 F.2d 612, 613 n.3 (7th Cir. 1987) (highlighting federal courts' "general duty to avoid deciding unnecessary issues"). Similarly, the court need not, and hence does not, decide any issues regarding Bankruptcy Code section 1129(c).

[46]    Mr. Birdsall testified at the confirmation hearing that he would likely prioritize the bankruptcy process to effectively marshal assets so as to increase the chances that the Whitelatch family can retain 100% of the value of nondebtor property.

**MEMORANDUM OPINION**       Page 23

extrinsic to the plan process and thus not within the scope of section 1129(a)(3) based on Ninth Circuit case law discussed above. In any event, the court does not believe HomeStreet engaged in bad faith in relation to the proposal of its plan.

First, the court disagrees with the debtors that HomeStreet acted in bad faith by proposing a liquidating plan. Although reorganizations are often preferable for a variety of reasons, liquidating chapter 11 plans are expressly contemplated by the statute.[47] Indeed, many of the nation's largest bankruptcy cases – including the Lehman Brothers, Washington Mutual, and Enron cases – were resolved through what were effectively liquidating plans. There is neither a categorical restriction on liquidating plans nor anything about these particular cases that would render a liquidating plan inappropriate.[48]

Second, HomeStreet filed its competing plan consistent with an agreement between the parties. As part of the mediation process before Bankruptcy Judge Heston, the parties agreed that the debtors' period of plan exclusivity would terminate. Once exclusivity lapsed, HomeStreet had the right to file a competing plan. Although consensual results are strongly encouraged in bankruptcy cases, no mechanism exists forcing such a result.[49] Standing on one's legal rights or zealously and aggressively pursuing those rights is not indicative of bad faith.[50]

---

[47] *See, e.g.*, 11 U.S.C. §§ 1123(a)(5)(D), 1129(a)(11), 1141(d)(3)(A); *Jorgensen v. Fed. Land Bank of Spokane (In re Jorgensen)*, 66 B.R. 104, 108-09 (B.A.P. 9th Cir. 1986) (noting that liquidating plans are permitted by the statute "and can be proposed in good faith"; affirming confirmation of creditors' liquidating plan over the debtors' objection); *In re Plant Insulation Co.*, 469 B.R. 843, 863 (Bankr. N.D. Cal. 2012) ("Proper use of Chapter 11 is not limited to cases in which the debtor preserves going-concern value. The Bankruptcy Code expressly authorizes the confirmation of a liquidating plan in a chapter 11 case. A liquidating plan furthers other policies embodied in the Bankruptcy Code: the orderly disposition of assets to maximize value, and the equal treatment of claims of similar priority. The decisions upholding liquidating plans indicate that a plan need not satisfy all of the goals of chapter 11 to be in good faith." (citations omitted)), *aff'd*, 485 B.R. 203 (N.D. Cal. 2012), *rev'd on other grounds*, 734 F.3d 900 (9th Cir. 2013).

[48] While the debtors' plan is styled as one of reorganization, the debtors recognize that it is likely to result in an eventual sale of all the debtors' assets (a result desired by the Whitelatch family). The debtors' plan is thus in some respects a liquidating plan, although the process and timing associated with any eventual sale might differ from HomeStreet's plan.

[49] Although it cannot be forced to stand down, the zealous creditor may yet get crammed down, the prospect of which often provides good reason to settle. *See, e.g.*, *In re Key Farms, Inc.*, 2020 Bankr. LEXIS 1642, at *9-10 (Bankr. E.D. Wash. June 23, 2020). Nevertheless, bankruptcy case law and lore are replete with examples where level heads did not prevail and aggressive creditors litigated their way to defeat, often to their regret. *See, e.g.*, *In re MPM Silicones, LLC*, 2014 Bankr. LEXIS 4062 (Bankr. S.D.N.Y. Sept. 17, 2014) (denying motions to change votes by secured creditors who took a litigation gamble and lost bigly); *In re Tribune Co.*, 464 B.R. 126, 134-35 (Bankr. D. Del. 2011) (reciting *The Scorpion and the Fox* parable as prelude for contested confirmation decision).

[50] *See, e.g.*, *In re Turner*, 574 F.3d 349, 356 (7th Cir. 2009) (observing that "[i]t is not bad faith to seek to advance one's economic interests by making a claim based on a defensible view of one's legal rights, even if the view

Creditors also have rights in bankruptcy cases.[51]  HomeStreet's choice to litigate with the debtors regarding competing plans and various other matters has undoubtedly been frustrating to the debtors,[52] but the court does not believe HomeStreet's actions in connection with the plan process implicate section 1129(a)(3).

Third, the debtors argue that HomeStreet behaved improperly when it negotiated a non-binding letter of intent with Resource Land Holdings for the possible sale of some of the debtors' real property (subject to, among other things, confirmation of HomeStreet's plan and court approval).  The existing record does not support a claim of actionable wrongdoing.  HomeStreet did not solicit the offer, Resource Land Holdings ultimately abandoned the offer, and the offer is not binding on the plan agent.  Additionally, Mr. Whitelatch made clear his disinterest in negotiating with Resource Land Holdings.  Regardless of the court's current

---

ends up being rejected"); *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990) ("Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of 'good faith'."); *Barr Co. v. Safeco Ins. Co. of Am.*, 1986 U.S. Dist. LEXIS 22145, at *12 (N.D. Ill. July 29, 1986) ("Safeco in refusing to make a larger settlement offer merely exercised its legal rights, and as a matter of law the exercise of legal rights is not bad faith."); *Badgett v. Sec. State Bank*, 116 Wn.2d 563, 570 (1991) ("As a matter of law, there cannot be a breach of the duty of good faith when a party simply stands on its rights to require performance of a contract according to its terms.").

[51]  *See, e.g.*, *Benedor Corp. v. Conejo Enters. (In re Conejo Enters.)*, 96 F.3d 346, 355 (9th Cir. 1996) (Fletcher, J., dissenting in part) ("Rehabilitation of debtors and maximization of estate assets are primary goals of the Bankruptcy Code, but there are limits.  Individual creditors have rights too."); *In re Jorgensen*, 66 B.R. at 107 ("A farmer-debtor is not immune from the burdens imposed by filing bankruptcy.  He may not comply only with those provisions which aid him but evade those which do not.  Upon becoming a debtor the farmer accepts the benefits subject to the risks.  To hold otherwise would limit a creditor's remedy to a motion to dismiss the bankruptcy.").  Indeed, in the early era of United States bankruptcy law, the bankruptcy process was essentially an expanded creditors' remedy, much like the modern involuntary petition.  *See, e.g.*, *In re Zamora*, 2020 Bankr. LEXIS 1963, at *9 (Bankr. E.D. Wash. July 27, 2020).

[52]  During closing argument, debtors' counsel observed that the current legal system creates incentives for oversecured lenders to be uncooperative or excessively litigious.  The court understands and appreciates the debtors' systemic concern, which arises from a combination of state debtor-creditor law (including the breadth of security interests potentially available to lenders, which was expanded by 2001's revisions to Article 9 of the UCC, and the permissibility of default-interest-rate and fee-shifting provisions in loan documents) and Bankruptcy Code section 506(b).  Indeed, various commentators argue that the current system allocates too much power to secured creditors and thereby distorts the leverage and negotiation dynamic intended when the Bankruptcy Code was first enacted in 1978.  *See, e.g.*, Harvey R. Miller & Shai Y. Waisman, *Is Chapter 11 Bankrupt?*, 47 B.C. L. Rev. 129, 130-31 (2005); Jay Lawrence Westbrook, *The Control of Wealth in Bankruptcy*, 82 Tex. L. Rev. 795, 843-44 (2004); Douglas G. Baird & Robert K. Rasmussen, *The End of Bankruptcy*, 55 Stan. L. Rev. 751, 754-55 (2002).  Striking the proper dynamic raises complex issues, including issues of economics, public policy, and even constitutional rights.  *See, e.g.*, *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589-95 (1935).  Resolving these complex issues while building a system that strikes a fair balance is a task that ultimately falls to Congress and state legislatures.  This court's duty is to apply the law as it exists today, even if that law is questionable from a policy perspective.  *See, e.g.*, *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 134-35 (2015); *RadLAX Gateway Hotel*, 566 U.S. at 649.

**MEMORANDUM OPINION**             Page 25

assessment, all parties' rights on this matter are reserved – nothing in HomeStreet's proposed plan releases or exculpates the bank for its conduct during these chapter 11 cases. So, if a viable cause of action exists in favor of the estates, it will pass to the plan agent. And any rights personal to the Whitelatch family will survive.

Further, the only connection between the plan *proposal* process and the letter of intent was HomeStreet's request to include a copy of the letter with its disclosure statement. The court approved that request after a hearing involving the debtors' counsel based on HomeStreet's position that the letter could prove material to creditors voting on the plan. Bankruptcy Code section 1125(e) generally insulates a party in connection with the plan solicitation process and there is no evidence or reason to believe that the voting process or ultimate outcome of the competing plans would have differed had HomeStreet not included the letter of intent with its disclosure statement. Thus, keeping in mind the narrow scope of what is actually relevant to a section 1129(a)(3) analysis, the court concludes that HomeStreet proposed its plan in good faith and not by any means forbidden by law.

## II.   HomeStreet's Proposed Plan Satisfies Section 1129(a)(9)

Bankruptcy Code section 1129(a)(9) contains several detailed rules regarding the payment of certain categories of claims. As relevant here, section 1129(a)(9)(A) establishes a requirement regarding allowed administrative expense claims: unless the claimant agrees otherwise, "on the effective date of the plan, the holder of such claim [must] receive on account of such claim cash equal to the allowed amount of such claim." Because many of these claims will not be "allowed" (or even filed) before the effective date of a plan, it is typical for chapter 11 plans to provide that allowed administrative expense claims will be paid on the later of the plan effective date and the date on which claims are finally allowed. HomeStreet's plan adopts this approach.

The debtors object to the HomeStreet plan based not on the substance of the administrative claim provision, but on its viability given the debtors' current cash position. The essence of the concern is that the allowed professional fees will exceed available cash and thus the plan agent will be unable to pay these fees once allowed, resulting in a default under the plan.

Although it is possible this scenario could occur, the court does not believe it is likely for several reasons, including because:

- The Circle Ground sale appears ready to close promptly following confirmation of a plan. Mr. Whitelatch testified that closing could occur at any time and debtors' counsel represented that the only reason for delay is the desire to utilize the special tax provisions of Bankruptcy Code section 1146(a). As such, the court sees no reason why this sale should not be consummated promptly after the effective date of HomeStreet's plan. The sale should generate proceeds in excess of the fees anticipated for professionals. While the Circle Ground is property of RC's bankruptcy estate, HomeStreet indicated a willingness to carveout funds from the sale proceeds to the extent necessary to satisfy the Claar estate's administrative expense claims. The debtors do not cite authority establishing that such a carveout or reallocation is impermissible. Moreover, as a practical matter, the source of funding professional fees is identical under the debtors' plan.

- Even if the Circle Ground sale for some reason is not consummated or yields inadequate proceeds, the plan agent will have time to generate additional funds (including specifically for the Claar estate, such as through the sale of inventory) before any professional fees have been finally allowed and hence become due and payable. HomeStreet's plan provides a thirty-day period after its effective date before final professional fee applications are due. Given the history of these cases, it is likely if not certain that there will be significant objections to the final fee applications, which will take time and perhaps an evidentiary hearing to resolve. Thus, there will not be liquidated sums finally allowed and due to the estate professionals until several weeks or even months after HomeStreet's plan becomes effective.

- The plan contains authority for the plan agent to borrow. Mr. Johnson testified that HomeStreet could loan additional funds to the extent necessary to fund the payment of administrative expenses and Mr. Birdsall testified that he would consider such a loan to avoid a default under the plan. Neither witness could testify about the details of a possible loan, but that is not surprising since the need for and amount of any loan are presently theoretical. In the end, if the plan agent cannot generate funds internally, HomeStreet's plan contains a mechanism to obtain funding elsewhere.

- As a result of the debtors' objection and questioning by the creditors' committee's counsel at the confirmation hearing, Mr. Birdsall is aware of this issue and should be motivated to take the steps necessary to obviate the problem.

Although improbable, if a funding problem comes to fruition, the unpaid administrative claimants will have remedies under the Bankruptcy Code. Any claimant not paid as required under HomeStreet's plan may move for an order compelling performance under Bankruptcy Code section 1142(b). A failure to comply with such order could constitute cause to dismiss or convert the cases under Bankruptcy Code section 1112(b) or even to revoke the confirmation order under section 1144. Of course, the court could also craft other remedies under section 105(a). To be clear, if holders of allowed claims are not paid as required by HomeStreet's plan, there will be consequences stemming from such a default.

In summary, the content of HomeStreet's plan is consistent with the requirements of Bankruptcy Code section 1129(a)(9) and the record establishes that the plan's requirements should be achievable. As such, the court overrules the debtors' objections premised on the potential nonpayment of professional fees.

### III.   HomeStreet's Proposed Plan Satisfies Section 1129(b)

Bankruptcy Code section 1129(b) codifies the "cramdown" power allowing nonconsensual confirmation of a plan over the rejection of an impaired class of claims or interests if certain requirements are met. Section 1129(b)(1) requires the plan proponent to demonstrate that "the plan does not discriminate unfairly, and is fair and equitable" while section 1129(b)(2) details nonexclusive requirements for a plan to be "fair and equitable" regarding rejecting classes of claims or interests. Here, the Whitelatch family, holders of equity interests in the debtors, has rejected HomeStreet's plan and essentially objected to confirmation. This rejection requires that the plan's treatment of their interests satisfy section 1129(b).

Section 1129(b)(2)(C)(ii) initially sets a low bar in relation to equity interests – a plan can be crammed down if "the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property." This requirement is necessarily satisfied in the case of common stock, many interests in LLCs, and other equity interests where there is no "junior" interest in the capital stack. Yet the "fair and equitable" test encompasses less obvious principles threshed out by case law that expand the analysis, which means the most-junior stakeholders can still raise fairness-based objections to confirmation of a plan their class rejected.

One uncodified principle is that classes senior to a rejecting class of claims or interests cannot receive more than their allowed claims.[53]  This principle can be violated when, for example, lenders try to effectuate a corporate takeover through the bankruptcy process and thereby capture residual equity or all-but-certain future upside for themselves at the expense of junior stakeholders.  HomeStreet's plan does not violate this principle because it provides for a straightforward monetization of the debtors' assets and distribution of the proceeds to holders of allowed claims in accordance with their relative priorities under the Bankruptcy Code.  By limiting each class's recovery and making distributions in accordance with statutory priorities, HomeStreet's plan does not inappropriately shift value from the Whitelatch family or let HomeStreet walk away with more than a 100% recovery on its allowed claims.[54]

More broadly, HomeStreet's plan fairly treats the equity interests of the Whitelatch family.  Although the court does not reach the issue of valuation for the reasons already stated, by almost all accounts the debtors' property presently appears to contain sufficient value to leave residual equity for the Whitelatch family.  HomeStreet's plan preserves that interest once the actual values are tested and realized through market exposure.  Any value remaining after satisfaction of creditors consistent with their legal rights belongs to the Whitelatch family.  Moreover, the plan includes procedural protections for the Whitelatch family, including express fiduciary duties for the plan agent and requirements for notice and a hearing before assets are sold or other significant events occur.[55]  These meaningful and multiple protections are sufficient to protect the Whitelatch family's equity interests and provide a fair and equitable treatment for purposes of section 1129(b).

---

[53]  *See, e.g.*, *In re Mcorp Fin., Inc.*, 137 B.R. 219, 235 (Bankr. S.D. Tex. 1992) (citing Kenneth N. Klee, *All You Ever Wanted to Know About Cram Down Under the Bankruptcy Code*, 53 AM. BANK. L.J. 133, 148, 149, 166 (1979)).

[54]  This issue was murkier in a prior version of HomeStreet's plan, which proposed to increase the postconfirmation interest rate on HomeStreet's claims above the parties' contract rate.  After the court inquired about the basis for such an increase, HomeStreet amended the plan to eliminate this feature, thereby avoiding the need to decide whether it violated section 1129(b) (or section 1129(a)(7)(A)(ii)).

[55]  Further, Mr. Birdsall testified credibly and with conviction that he understands that his duties as plan agent extend to all stakeholders, including the Whitelatch family, and that he intends to accommodate continued participation by the Whitelatch family in the enterprise, both in terms of the day-to-day operations and with respect to any significant decisions.

**MEMORANDUM OPINION**                    Page 29

IV.    The Debtors' Additional Objections Do Not Bar Confirmation of
       HomeStreet's Proposed Plan

The debtors have advanced additional arguments against confirmation of
HomeStreet's plan.  The court addresses each in turn.

First, the debtors contend that the plan improperly extends a lien on real
property RC granted as adequate protection when seeking authority to use cash
collateral.  Nothing in the Bankruptcy Code prohibits such extension.  Rather,
Bankruptcy Code section 1123(a)(5)(E) expressly permits plans to provide for
"modification of any lien."  Moreover, obligations under a plan may be secured by
newly created security interests, as both the debtors' plan and HomeStreet's plan
propose to do for general unsecured creditors.  As with the existing adequate-
protection lien, the continuing lien will encumber the property only to the extent of
diminution in HomeStreet's petition date collateral interests.[56]  And, as mentioned
above, HomeStreet will not receive more than a 100% recovery on its underlying
claims.  So, if HomeStreet is oversecured to the extent the debtors maintain, any
additional security for HomeStreet is largely superfluous.  Because there is no
authority rendering this provision improper, this aspect of HomeStreet's plan
presents no obstacle to its confirmation.

Second, the debtors question whether Mr. Birdsall is capable of serving as
plan agent, including by noting his lack of experience in the wine industry and the
fact that he has not yet obtained any alcohol-related licenses necessary to operate
the debtors' business.  Mr. Birdsall's testimony established that he is a credible and
experienced businessperson who has competently performed as a receiver or
similar responsible actor in cases involving varied and complex agricultural
businesses, including other bankruptcy cases in the Eastern District of Washington.
Based on his testimony, the court is confident that Mr. Birdsall will devote the
effort necessary to get up to speed on the details of the debtors' operations and will
retain or consult with specialists if needed.  Mr. Birdsall also testified that he
desires to work closely with the Whitelatch family to benefit from their experience
and to keep them involved in the enterprise (and it would be financially rational for

---

[56]   The parties disagree about whether there has been diminution in the value of HomeStreet's collateral and, if so,
its extent.  It is premature and unnecessary to resolve this issue now.  The debtors' cases are still pending and
their business still operating, so collateral values could remain in flux.  Moreover, the terms of the HomeStreet
plan simply roll forward the status quo and do not require fixing the extent of the diminution (if any) as a
predicate to confirmation or effectiveness of the plan.  Finally, as noted above, this issue may be academic if
HomeStreet is ultimately paid in full through other assets.  All parties' rights, claims, defenses, and arguments
regarding this issue are reserved for future determination if such a determination is warranted.

**MEMORANDUM OPINION**            Page 30

the Whitelatch family to respond in kind). Moreover, Mr. Birdsall testified that he intended to file the state and federal applications necessary to obtain alcohol-related licenses in advance of, and in preparation for, confirmation of HomeStreet's plan. If Mr. Birdsall or the parties believe that this process poses an obstacle to implementation of the plan, HomeStreet might delay the effectiveness of its plan to create a window during which any remaining issues could be resolved. For all these reasons, the court has confidence that Mr. Birdsall will navigate any near- or long-term operational obstacles and does not believe his selection as plan agent precludes confirmation of HomeStreet's plan.

Third, the debtors argue that HomeStreet's plan violates Bankruptcy Code section 365(d)(2), which provides that an estate representative "may assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor at any time *before the confirmation of a plan*" (emphasis added). The debtors contend that a provision of HomeStreet's plan allowing the plan agent sixty days after its effective date to determine whether to assume or reject executory contracts or leases is inconsistent with section 365(d)(2). This argument overlooks that section 365(d)(2) is permissive rather than mandatory, and that section 1123(b)(2) is a separate provision allowing the assumption and rejection of contracts not previously rejected under section 365. The two sections must be read together and harmonized by treating them as distinct permissive provisions addressing different temporal periods.[57] This is the reading that courts in the Ninth Circuit and elsewhere have adopted[58] and that the leading bankruptcy treatise endorses.[59]

---

[57] *See, e.g.*, *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988) ("Statutory construction, however, is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme – because the same terminology is used elsewhere in a context that makes its meaning clear or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." (citations omitted)); *Duparquet Huot & Moneuse Co. v. Evans*, 297 U.S. 216, 218 (1936) ("To fix the meaning of these provisions there is need to keep in view the background of their history. There is need to keep in view also the structure of the statute, and the relation, physical and logical, between its several parts."); *see also generally City of Chicago v. Fulton*, 592 U.S. ___, 2021 U.S. LEXIS 496, at *8-11 (Jan. 14, 2021) (explaining how Bankruptcy Code sections 362(a)(3) and 542 must be read together to give function to each and to harmonize those functions).

[58] *See, e.g.*, *DJS Props., L.P. v. Simplot*, 397 B.R. 493, 498-501 (D. Idaho 2008) (affirming bankruptcy court's confirmation of plan with a postconfirmation assumption/rejection period based on section 1123(b)(2)'s separate function; citing several decisions from other jurisdictions supporting this result and rejecting arguments that Ninth Circuit case law is to the contrary).

[59] *See* 3 COLLIER ON BANKRUPTCY ¶ 365.05[2] (16th ed. rev. 2020) ("Assumption or rejection is permitted postconfirmation.").

A contrary construction would prove problematic in the context of cases such as these involving a creditor's plan. Before confirmation, only the debtor in possession has rights under section 365. So a statutory scheme in which those rights evaporate before confirmation would cause "the parties to a reorganization case [to] be deprived of a flexible mechanism" designed to benefit the estate broadly.[60] Such a scheme might also create odd incentives, such as to force conversion of a case or appointment of a chapter 11 trustee if the debtor unreasonably refuses to act regarding a key contract.

Although the court concludes that a postconfirmation assumption and rejection period is generally permissible, inclusion of such a period is particularly appropriate here based on HomeStreet's representation that only the alleged lease between the Whitelatch Living Trust and RC is under consideration. The court has already extended deadlines relating to this alleged lease multiple times with the consent of all parties and it is in everyone's interest to allow the plan agent a window in which to finally resolve the issue.

Fourth and finally, the debtors assert that HomeStreet's plan does not properly account for a potential secured claim that the RC estate has against the Claar estate as a result of RC's sales of grapes to Claar. HomeStreet's plan does not expressly address this issue, and, therefore, does not extinguish any rights. Any such intercompany rights will pass to the plan agent, who can assess and determine an appropriate way to proceed (either by giving effect to the asserted RC secured claims to reallocate some value from the Claar estate to the RC estate, or by disputing RC's asserted claims or security interests, or by compromising the dispute). If the debtors are correct that these are cases involving two solvent estates, then the issue may ultimately be theoretical insofar as the reallocation of value will not alter any creditor's recovery. Once again, this may be a dispute lurking in the background of these cases that might necessitate adjudication one day, but it is not a dispute precluding confirmation of HomeStreet's plan today.

V.    Summary Regarding HomeStreet's Proposed Plan

Although the debtors have vigorously challenged HomeStreet's plan on various fronts, the plan satisfies the requirements set forth in Bankruptcy Code section 1129. Counsel for HomeStreet should prepare a proposed form of confirmation order.

---

[60] *See, e.g., Alberts v. Humana Health Plan, Inc. (In re Greater Se. Cmty. Hosp. Corp.)*, 327 B.R. 26, 34 (Bankr. D.D.C. 2005).

### *Resolution of Pending Discovery Motions*

The debtors and HomeStreet have pending discovery motions in which each side seeks to compel discovery and sanction the other side for failure to produce responsive documents. As a general matter, the federal rules are "to be broadly construed with a bias in favor of wide-open discovery."[61] Here, neither side has behaved in full accordance with this principle; the record demonstrates that both sides have adopted stingy or technical constructions of discovery requests. These actions fostered suspicion and perpetuated in-kind responses resulting in numerous follow-up emails, calls, and hearings before the court. The parties' discovery conduct in these cases – including tit-for-tat reactions – reflects what is probably an insoluble problem with any discovery rules: a determined advocate can usually throw enough sand in the gears to cause the process to breakdown. Behavior that foments discovery disputes is neither consistent with the overarching purpose of the rules (i.e., "to secure the just, speedy, and inexpensive determination of every action and proceeding"[62]) nor required as part of zealously representing a client.

Although both sides have approached their discovery obligations in a combative and uncooperative way, the court is not convinced that either crossed the line into sanctionable behavior. Stingy constructions of discovery requests are certainly at odds with an open and expansively responsive process, but such constructions differ in kind from deliberately concealing documents or outright gamesmanship. Moreover, there is no indication that any discovery-related conduct in these cases impaired either side's ability to fully and fairly prosecute its respective case on the merits. The absence of demonstrated prejudice to either moving party further weighs against imposing sanctions.[63] As such, the court hereby denies all pending motions relating to discovery issues.[64]

---

[61] *E.g.*, *Alig-Mielcarek v. Jackson*, 286 F.R.D. 521, 525 (N.D. Ga. 2012).

[62] Fed. R. Civ. P. 1.

[63] *See, e.g.*, *Noble v. Ne. Ill. Reg'l Commuter R.R.*, 130 F. Supp. 3d 1166, 1178 (N.D. Ill. 2015) (denying request for discovery sanctions when moving party suffered no prejudice); *Gayle Martz, Inc. v. Sherpa Pet Grp., LLC*, 2009 U.S. Dist. LEXIS 80929, at *21-22 (S.D.N.Y. Sept. 2, 2009) (same).

[64] Although the court declines to impose sanctions, the court is mindful that both sides have incurred significant attorneys' fees related to discovery issues. All parties' rights are reserved regarding the reasonableness and allowability of these fees (both as to the debtors' professionals under Bankruptcy Code section 330(a) and as to HomeStreet's professionals under Bankruptcy Code section 506(b)).

## SUMMATION

These have been hard-fought chapter 11 cases in which the debtors and HomeStreet vigorously advanced their respective positions. After applying the legal framework Congress codified in the Bankruptcy Code, the court has determined that the debtors' plan does not satisfy the requirements for confirmation under Bankruptcy Code section 1129 while HomeStreet's plan does. As such, the court is prepared to enter an order confirming the HomeStreet plan and containing formal findings and conclusions consistent with this opinion. The court will schedule a telephonic status conference with the parties to discuss next steps, including presentation of a proposed form of confirmation order by HomeStreet.